UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH J. DIBENEDETTO,
      Plaintiff,

vs.

NATIONAL RAILROAD PASSENGER
CORPORATION,
      Defendant.

CIVIL ACTION NO.:  04-10570-RCL

## DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION'S MOTION IN LIMINE TO PRECLUDE THE TESTIMONY OF THE PLAINTIFF'S EXPERT WITNESSES

The defendant National Railroad Passenger Corporation ("AMTRAK") moves in limine to exclude the testimony of the plaintiff's expert witnesses, Dr. Jesse Jupiter and Robert Andres, on the grounds that: (1) neither of these witnesses were identified or disclosed in a timely fashion, or in compliance with Fed. R. Civ. P. 26's disclosure requirements; and (2) their expected opinions do not meet the requirements of Fed. R. Evid. 702 and the standards established by the Supreme Court in Daubert v. Merrill-Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  As further grounds, the defendant states as follows:

### I.      FACTUAL BACKGROUND:

The plaintiff claims in this Federal Employers' Liability Act ("FELA") case that he was injured as a result of exposure to cumulative trauma that he experienced in his railroad workplace over the course of several years.[1]  He has been employed by the

---

[1] The plaintiff filed his original *Complaint* on September 20, 2002. The plaintiff had been experiencing symptoms in his right wrist going back more than three (3) years beforehand. *See* Dr. Mark C. Gebhardt medical record, a copy of which is attached as Exhibit "A"; *see also* relevant portions of plaintiff's deposition transcript at p. 51-54, copies of which are attached as Exhibit "B."  He even complained to his doctors about these symptoms on August 20, 1999. Exh. A.  Moreover, the plaintiff specifically attributed the onset of these symptoms with his work-related activities. Id. (the plaintiff related that his symptoms

defendant as a carman since the mid-1980's. A carman performs a variety of routine maintenance and repair tasks on railroad passenger cars, including changing brake shoes, changing out air hoses and installing and disconnecting electric cables. The plaintiff claims that the everyday activities of his job (primarily the use of a hammer) exposed him to "occupational risk factors for carpal tunnel syndrome, including but not limited to repetition, force, vibration and awkward wrist posture" and resistive motions of the hand and wrist which have led to his injuries. *See* plaintiff's *Complaint*, ¶8, a copy of which is attached hereto as Exhibit "C." He also claims that his injuries were caused by the defendant's "failure to provide a timely and adequate ergonomic program designed to prevent occupational carpal tunnel syndrome." Id. at ¶9(b).

In his *Complaint*, the plaintiff specifically alleged that he suffered right "carpal tunnel syndrome" as a result of these workplace activities. Exh. C at ¶11-13. The *Complaint* fails to mention any other injury or medical condition. Yet the plaintiff has never been diagnosed with, or treated for, carpal tunnel syndrome. Exh. B at 195-197. Instead, the plaintiff's treating physician, Dr. Jesse Jupiter, has diagnosed "interarticular arthritis" of the right wrist, a completely distinct and unrelated medical condition. *See* Dr. Jupiter's October 10, 2005 letter to plaintiff's counsel, a copy of which is attached as Exhibit "D."

In his records pertaining to his care and treatment of the plaintiff, Dr. Jupiter never diagnosed carpal tunnel syndrome and instead gave interarticular arthritis as the only diagnosis. He also failed, at any point in his medical records, to indicate an opinion as to the cause of this condition or that the plaintiff suffers from a permanent partial

---

were "aggravated by swinging a hammer" and that they were brought on by "resistive motions of the hand and wrist"); Exh. A; Exh. B at p. 51-54.

disability. More specifically, he did not opine, in his records or otherwise, that the plaintiff's arthritis was caused by the repetitive nature of his work activities.

The plaintiff has failed to identify and/or properly disclose a single liability or medical expert witness to testify that his injuries were caused by his workplace activities.[2] The plaintiff on November 7, 2005 (after the discovery and Rule 26 deadlines had long since passed), in a letter to defendant's counsel, identified Robert Andres as a potential witness. This was the first notice that the defendant ever received regarding the plaintiff's intention to use Mr. Andres. Plaintiffs' counsel's November 7, 2005 letter stating that he intended to use Mr. Andres did not comply with the requirements of expert disclosure under Rule 26. To date, the plaintiff has failed to provide any disclosures regarding Mr. Andres or any other liability expert.

The plaintiff has also failed to identify Dr. Jupiter, or any other physician, as an expert medical witness and has failed to provide any of the disclosures required by Rule 26 with any opinion testimony which he expects to elicit from Dr. Jupiter. Dr. Jupiter did write a letter to plaintiff's counsel dated October 10, 2005, in which he mentioned a number of issues which he had never before mentioned in the records of his care and treatment of the plaintiff. Exh. D. However, the plaintiff did not produce this letter to defendant's counsel until on or about October 25, 2005. *See* letter from plaintiff's counsel dated October 25, 2005, a copy of which is attached as Exhibit "E." The letter describes Dr. Jupiter's treatment of the plaintiff including a statement that the plaintiff's

---

[2]In case such as this, involving complex medical issues, where the causal connection is not obvious to a layman, "such as a broken leg from being struck by an automobile," expert testimony is required. Schmaltz v. Norfolk & Western Ry., 896 F. Supp. 180 (N.D.Ill. 1995) *quoting* Moody v. Maine Central Railroad Co., 823 F. 2d 693, 695 (1st Cir. 1987); *see also* Claar v. Burlington Northern Railroad Co., 29 F.3d 499, 503 (9th Cir. 1994) ("where special expertise is necessary to draw a causal inference, expert testimony is necessary."); 4 F. Harper, F. James, O. Gray, The Law of Torts, 269.

"symptoms appear to be precipitated by events that occurred while in his employment."
Exh. D. Dr. Jupiter also states that the plaintiff has a 20% permanent partial disability of
his right wrist – this prognosis was never before expressed in Dr. Jupiter's records.

To the extent this letter purports to qualify as a Rule 26 disclosure,[3] it is untimely.
The pre-trial orders in this case established a deadline of December 31, 2004 for the
plaintiff to disclose his experts and a deadline of February 27, 2005 for expert discovery.
*See* docket report, a copy of which is attached hereto as Exhibit "F." The Court, on June
9, 2005, also set a date for trial and stated that "no more discovery will be allowed in this
case." Id. The Court has also consistently enforced its deadlines in this case. For
instance, the Court on August 4, 2005 denied the defendant's motion to conduct
discovery and <u>designate expert witnesses</u>. A copy of the defendant's *Motion for Leave to
Conduct Discovery* and the Court's *Order* denying the motion, are attached as Exhibit
"G." More recently, on December 23, 2005, the Court denied the plaintiff's *Motion to
Enter Premises*, which sought permission to have Mr. Andres conduct a site inspection,
stating that this motion "has been filed well after the deadline set by the court for the
completion of discovery." A copy of the Court's December 23, 2005 *Order* is attached
as Exhibit "H."

## II.    DISCUSSION OF LAW:

### A.    Dr. Jupiter's Opinions, Which Were Neither Developed Nor Expressed During The Normal Course Of His Care And Treatment Of The Plaintiff, Should Be Excluded Because The Plaintiff Has Not Identified Dr. Jupiter As An Expert and Has Otherwise Failed to Comply With Rule 26's Requirements:

---

[3] It is the defendant's position that Dr. Jupiter's letter does not meet Rule 26's disclosure requirements. The letter itself does not contain an adequate description of Dr. Jupiter's expected testimony, nor does he express any opinion to the requisite degree of certainty. Moreover, the plaintiff has failed, to date, to provide any of the other information required by Rule 26, such as Dr. Jupiter's curriculum vitae, a list of his publications, a schedule of charges or Dr. Jupiter's testimonial history.

4

The plaintiff has failed to identify Dr. Jupiter as an expert witness. He has also failed to provide any of the disclosures required by Rule 26. Therefore, Dr. Jupiter should be excluded from testifying about opinions which were neither developed nor expressed during the normal course of his care and treatment of the plaintiff, including but not limited to the cause of the plaintiff's injuries.

> Fed. R. Civ. P. 26(a)(2) requires:
>
> Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed. R. Civ. P. 26(a)(2)(B). Although a treating physician may, in certain circumstances, be deposed or called to testify at trial without adhering to the requirement of a written report, a treating physician who has formulated opinions going beyond what was necessary to provide appropriate care for the injured party steps into the shoes of a retained expert for purposes of Fed. R. Civ. P. 26(a)(2) and a written report is required. Thomas v. Consolidated Rail Corporation, 169 F.R.D. 1, 2-3 (D. Mass 1996); *see also* Musser v. Gentiva Health Servs., 356 F.3d 751 (7th Cir. 2004); Wreath v. United States, 161 F.R.D. 448, 449 (D. Kan. 1995); O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1105 n.14 (7th Cir. 1994) (we do not distinguish the treating physician from other experts when the treating physician is offering expert testimony regarding causation). In

5

Thomas, the Court stated that when treating physicians are going to testify, not merely based on observations made during the course of treatment but on professional expertise going beyond the treatment per se (i.e., causation and prognosis), a report pursuant to Fed. R. Civ. P. 26(a)(2) is required. Thomas, 169 F.R.D. at 3. The Thomas Court recognized "the unfairness of permitting a party to employ a physician who treated an injured party to provide testimony extending beyond simply the care of the plaintiff to classic expert opinion regarding causation and prognosis." Id. at 2.

As discussed *supra*, Dr. Jupiter treated the plaintiff for, and diagnosed the plaintiff with, interarticular arthritis of the right wrist. Exh. D. However, during the course of Dr. Jupiter's treatment of the plaintiff, which was primarily conducted between May 2001 and September 2002, Dr. Jupiter never opined as to the cause of the plaintiff's arthritis. Id. The records of his care and treatment of the plaintiff are completely devoid of any mention of the cause of the plaintiff's arthritic condition. Likewise, Dr. Jupiter never, before October 10, 2005, mentions that the plaintiff has incurred a 20% permanent partial disability of the right wrist. Dr. Jupiter never even implied that the plaintiff's injuries may have been causally related to his employment with the defendant. Since September 2002, the plaintiff has seen Dr. Jupiter for routine check-ups twice. Id. Consistent with his previous treatment, Dr. Jupiter, at these most recent appointments, neither discussed nor opined on the cause of the plaintiff's injuries. Id.

It is also important to note that trial in this case was originally scheduled to begin on September 19, 2005. At that time the plaintiff, who has (unlike the defendant) been represented by the same counsel since the beginning of this case in 2002, had not yet identified any expert liability witness. The first time the potential of Dr. Jupiter giving

expert opinions on causation and prognosis surfaced was more than one (1) month later

(in the October 25, 2005 letter). This was the first notice that the defendant ever received

regarding the plaintiff's intention to use Dr. Jupiter for these purposes. This letter was

sent more than ten (10) months after the Court's expert disclosure deadline. Therefore,

the plaintiff should not be allowed to use Dr. Jupiter as an expert witness. This precludes

Dr. Jupiter from offering any opinions on causation and prognosis.

The plaintiff has also, with respect to Dr. Jupiter, failed to comply with Fed. R.

Civ. P. 26 (a)(2). Neither Dr. Jupiter's October 10, 2005 letter to plaintiff's counsel, nor

plaintiff's October 25, 2005 letter to defendant's counsel, comply with the requirements

of expert disclosure under Rule 26. Rule 26 requires a written report prepared and signed

by the expert witness, the qualifications of the witness, a list of the witness' publications,

the compensation received by the witness and a list of testimony that the witness has

given in the last four (4) years. Fed. R. Civ. P. (a)(2)(B). Pursuant to Fed. R. Civ. P. 26

(a)(2)(C), these disclosures shall be made in accordance with the Court's order. To date,

none of these requirements have been met. As discussed *supra*, the plaintiff has missed

the Court's deadline for expert disclosure by nearly a full year.

Moreover, Rule 26 (a)(2)(C) requires, absent deadlines set by the court, that

expert  disclosures shall be made at least ninety (90) days before the trial date. The trial

of this case is scheduled for January 23, 2006. The plaintiff has therefore missed the

ninety (90) day deadline imposed by the Rule. On these grounds as well, the plaintiff

should be foreclosed from eliciting opinion testimony from Dr. Jupiter.

The plaintiff has not disclosed Dr. Jupiter as an expert nor has he provided the

required Rule 26(a) disclosures and therefore, Dr. Jupiter should be excluded from

testifying about opinions which were neither developed nor expressed during the normal course of his care and treatment of the plaintiff, including but not limited to, the cause of the plaintiff's injuries.

**B.    The Plaintiff Has Also Failed To Meet Rule 26's Disclosure Requirements With Respect to Mr. Andres:**

The plaintiff has also failed to properly disclose Mr. Andres. To date, the plaintiff has failed to provide any report authored by Mr. Andres, and has also failed to provide any of the other information required by Rule 26. It is now less than ninety (90) days before trial and the Court's disclosure deadlines have long since passed. The defendant is now left in the position of not having any idea what Mr. Andres might say at trial. The rules are designed to prevent this. Thus, Mr. Andres should not be allowed to testify at trial.

**C.    The Opinions of Each of the Plaintiff's Expert Witnesses Are Inadmissible Because They Do Not Meet The Requirements of Rule 702 and Daubert:**

The plaintiff must present reliable, admissible evidence that the arthritis he allegedly sustained was caused by the defendant's negligence. The plaintiff intends to prove causation via the testimony of his expert physician, Dr. Jupiter, and Mr. Andres. Both of these experts should be precluded from testifying because their conclusions and opinions fail to meet the requirements of Fed. R. Evid. 702 and the standards established by the Supreme Court in <u>Daubert v. Merrill-Dow Pharmaceuticals, Inc.</u>, and its progeny. 509 U.S. 579.

**1. The Admissibility Of Expert Testimony Under Rule 702 and <u>Daubert</u>:**

Fed. R. Evid. 702 governs the admissibility of expert testimony:

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify

8

thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.[4]   Rule 702 generally embodies the following factors, which were established by the Supreme Court in <u>Daubert</u>, that a trial judge must consider when considering the admissibility of expert testimony:

> (1) whether the expert's technique or theory can be or has been tested - that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

Fed. R. Evid. 702, *Advisory Committee Notes to the 2000 Amendments; see also* <u>Daubert</u>, 509 U.S. at 591-95.[5]

In <u>Daubert,</u> "the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony." Fed. R. Evid. 702, *Advisory Committee Notes to the 2000 Amendments.*  When faced with the proffer of expert testimony under Rule 702, the trial judge, pursuant to Rule 104(a), must make a preliminary assessment of whether the testimony's underlying reasoning or methodology

---

[4] Rule 702 and <u>Daubert</u> govern the admissibility of expert testimony in FELA cases: "[t]he standard of causation under the FELA and the standards for admission of expert testimony under the Federal Rules of Evidence do not affect one another." <u>Claar v. Burlington Northern Railroad Co.</u>, 29 F.3d 499, 504 (9th Cir. 1994); *see also* <u>Eggar  v. Burlington Northern Railroad Co.,</u> 1991 U.S. Dist. LEXIS 19240 (D. Montana 1991) ("The evidentiary standards for evaluating the admissibility of expert testimony are not modified by the standard of proof in FELA cases" ).

[5] Additional factors for analyzing the reliability of opinion testimony have since been identified. *See, e.g.* <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, 43F.3d 1311, 1317 (9th Cir. 1995) (whether an expert is "proposing to testifying about matters growing naturally and directly out of research they have conducted independant of the litigation, or whether they have developed their opinions expressly for purposes of testifying."); <u>Claar</u>, 29 F.3d 499 (whether the expert has accounted for obvious alternative explanations-testimony excluded because the expert failed to do so); *see also* <u>In re: Paoli Railroad Yard PCB Litigation,</u> 35 F.3d 717, 742 at n. 8 (3rd Cir. 1994).

is scientifically or technically valid and properly can be applied to the facts at issue.[6]
Daubert, 509 U.S. at 592-93. The Court in Daubert reasoned that an expert's opinion
must be based on "methods and procedures of science," rather than on "subjective belief
or unsupported speculation." Daubert, 509 U.S. at 592-93.

The more subjective and controversial the expert's inquiry, the more likely the
testimony should be excluded as unreliable. See O'Conner v. Commonwealth Edison
Co. 13 F.3d 1090 (7th Cir. 1994). An expert's opinion cannot be based solely on the
weight of his own authority: "[n]othing in either Daubert or the Federal Rules of
Evidence requires a district court to admit opinion evidence that is connected to existing
data only by the ipse dixit of the expert." Polaino v. Bayer Corporation, 122 F. Supp. 2d
63, 67 (D. Mass. 2000). "The expert must explain precisely how [he] went about
reaching [his] conclusions and point to some objective source...to show that [he has]
followed the scientific method, as it is practiced by (at least) a recognized minority of
scientists in [his] field." Lust v. Merrell Dow Pharmaceuticals, Inc, 89 F.3d 594 (9th Cir.
1996), citing Daubert, 509 U.S. at 592-93.

2.    **Any Opinion That So-called "Repetitive Stress" Injuries Can Be
        Caused by Any Occupational Task Is Inadmissible Since This
        Relationship Is Neither Generally Accepted in the Relevant Medical
        Community Nor Is Any Opinion on this Issue Based on Reliable
        Scientific Methodology:**

The cause of repetitive stress illness is a controversial subject about which very
little is generally accepted in the medical community. Reports (for instance, a National
Institute for Occupational Safety and Health ["NIOSH"] report published in 1997 entitled

---

[6]Under Rule 104(a), the proponent has the burden of establishing that the pertinent admissibility
requirements are met by a preponderance of the evidence. See Bourjaily v. United States, 483 U.S. 171
(1987).

*Musculoskeletal Disorders and Workplace Factors*) have suggested that some occupations expose workers to certain "risk factors"[7] which have been associated with a higher incidence of repetitive stress illnesses in these occupations. However, there are no peer-reviewed articles of controlled studies which conclusively prove this relationship. In fact, most such studies reach the opposite conclusion.[8]

Most importantly, there has been no "dose-response" relationship demonstrated in any peer-reviewed, controlled, published study establishing a "threshold phenomenon" pertaining to any of these "risk factors" above which an individual in any occupation will develop a repetitive stress illness.[9] Mr. Andres has recently admitted that "quantified dose-response information is not available." *See* Mr. Andres' *Report in the Matter of Bashant et al. v. Metro-North Commuter Railroad,* a copy of the relevant excerpt of which is attached as Exhibit "I," at p. 8. Mr. Andres has also admitted that no dose-

---

[7]These "risk factors" are force, repetition, vibration, awkward posture and cold.

[8]*See, e.g.,* Yokum, David, *The Many Faces of Carpal Tunnel Syndrome,* ARCHIVES OF INTERNAL MEDICINE, vol. 158, p. 1496 (July 27, 1998)("There remains a great deal of controversy in terms of CTS' cause and relationship to work-related problems. In fact, most studies have not found an association between idiopathic CTS and upper extremity usage..."); Rayan, Gnazi M. *Understanding and Managing Carpal Tunnel Syndrome* THE JOURNAL OF MUSCULOSKELETAL MEDICINE, vol. 16, p. 654 -663, at p. 657, (Nov. 1999) ("The role of occupational activities alone in causing CTS is controversial and remains inconclusive."); Nathan, Peter A. et al., *Obesity as a Risk Factor For Slowing of Sensory Conduction of the Median Nerve in Industry,* JOURNAL OF OCCUPATIONAL MEDICINE, vol. 34, no. 4, p. 379 - 383, at p. 379 (April 1992) ("individual characteristics , not job-related factors, are the primary determinants of slowing sensory conduction of the median nerve and carpal tunnel syndrome."); Schottland, John R. et al., *Median Nerve Latencies in Poultry Processing Workers: An Approach to Resolving the Role of Industry "Cumulative Trauma" in the Development of Carpal Tunnel Syndrome,* JOURNAL OF OCCUPATIONAL MEDICINE , vol. 33, no. 5, at p. 627-631, at p. 627 (May 1991) ("Our data provide very little evidence for the concept of cumulative trauma as a prominent cause of carpal tunnel syndrome in American industry"). If requested, defense counsel will make copies of these articles available for the Court to review.

[9]A "dose-response relationship" is defined as "[a] relationship in which a change in amount, intensity, or duration of exposure is associated with a change - either an increase or a decrease - in risk of disease." *Reference Manual on Scientific Evidence,* The Federal Judicial Center (1994) at p. 174. A "threshold phenomenon" is "[a] certain level of exposure to an agent below which disease does not occur and above which disease does occur." Id. at p. 178.

response relationship between the risk factors and any occupation in the railroad industry

has been established - he recently testified, in another case,[10] as follows:

> Q.    I'm asking are you aware of any scientific study, whether by the railroad or any source, that quantifies the risk factors that are encountered in the railroad industries.
>
> A.    ...not that I am aware of.
>
> Q.    Is there any peer reviewed literature that you are aware of that quantifies the optimal amount repetition that an employee in the railroad can have in any particular task?
>
> A.    ...not that I have seen.
>
> Q.    Same question, any type of study concerning awkward postures, that you are aware of, scientific study that's been submitted to peer review where it states the optimal amount of awkward posture that a railroad employee should be subjected to.
>
> A.    ...even in the research literature that is not related to railroads, again, we don't have an equation for any particular individual that says that this much repetition is just enough and if you go just beyond this then it's too much. That's the type of dose response relationship information we don't have.
>
> Q.    Do you have any dose response information concerning the tasks that are performed by the 15 employees that are involved in this case, for the different tasks that they perform.
>
> A.    Again, since we don't have an equation that directly relates the dose to the adverse health outcome, I would have to say that I don't have an equation like that. I haven't seen anything like that published.

*See* deposition of Mr. Andres in the Pretter case, a copy of the relevant excerpt of which is

attached as Exhibit "J," at p. 69-71.  Mr. Andres has also admitted that there is no dose-

response relationship pertaining to any of the tools that railroad workers use.  Id. at p. 81.

---

[10]Dr. Andres was retained by the plaintiff in the case of Pretter v. Metro North Commuter R. Co. , which involved fifteen railroad workers who claimed they had incurred carpal tunnel syndrome as the result of their various railroad occupations.  The trial judge in Pretter excluded Dr. Andres from testifying, essentially on the same grounds which are argued herein.  *See* Pretter v. Metro North Commuter R. Co., 206 F. Supp. 2d 601 (S.D.N.Y. 2002).

The state of the medical evidence today strongly refutes the causal relationship between any type of railroad work and repetitive stress illnesses. The only peer-reviewed, controlled study of the causal relationship between railroad work and repetitive stress illnesses was completed in February 2002 by a team led by Dr. James L. Cosgrove of the University of Pittsburgh Medical Center Department of Physical Medicine and Rehabilitation. *See* Cosgrove, James L., et al., *Carpal Tunnel Syndrome in Railroad Workers*, JOURNAL OF PHYSICAL MEDICINE & REHABILITATION, vol. 81(2), p. 101-107 (February 2002), a copy of which is attached as Exhibit "K." The Cosgrove study definitively proves that "occupational classification was not associated with the presence of CTS." Id. at p. 105. It is particularly significant that the individuals who were the subject of the Cosgrove study were randomly selected from a pool of 2,500 railroad workers who had actually filed claims against their railroad employers, just like the plaintiff here. Id. at p. 101.[11]

It is clear, in the wake of the Cosgrove study, that there is no causal relationship between railroad activities and the development of repetitive stress illnesses. Any claim otherwise, by the plaintiff and/or his experts in this or any other FELA case, is, at best, unreliable, certainly specious, and, perhaps, fraudulent. There is simply no basis for an expert, in this or any other case, to opine that the plaintiff's work-related activities caused his arthritis. Any opinions attempting to link the plaintiff's illness to his work activities

---

[11]Three other points established by the Cosgrove study are particularly important. First, the study classified subjects into groups according to the strenuousness of the type of occupational activities each subject performed and found that "there was no trend of increased findings of CTS" even in "the groups with higher ergonomic stress." Exh. K at p. 105. The Cosgrove study also found that more than half (56.5%) of the study population (who had been diagnosed as having CTS by their attorneys at "screening events," and filed claims based thereon) actually did not have CTS at all. Id. It is perhaps even more shocking that one-third of the claimants who had undergone surgery did not actually have CTS. Id.

fail to meet the requirements of Rule 702 because they are not "the product of reliable principles and methods."

Dr. Jupiter's October 10, 2005 letter is completely devoid of any foundation for his conclusion that the plaintiff's arthritic condition was "precipitated by his work." He makes no mention of any report or study that supports his conclusory observation. He does not discuss, in any way, shape or form, the requisite dose-response relationship. there is no support for his opinion other than his own *ipse dixit*. Therefore, even if this Honorable Court finds that Dr. Jupiter and Mr. Andres were not untimely or indadequately disclosed, their testimony must nevertheless be excluded for failure to comply with Fed. R. Civ. P. 702 and/or Daubert.

It is clear that Dr. Cosgrove has recognized the ramifications of plaintiffs' lawyers and their cadre of experts creating unreliable medical diagnoses for the sole purpose of fostering litigation:

> ...it must be recognized that there are clear societal implications for the current practice in screening for CTS. Declaring an individual as having CTS has profound effects on feelings of health and well-being, employee-management relations, legal proceedings, and medical procedures. It is incumbent on electromyographers to employ rigorous and appropriate standards in the performance of carpal tunnel evaluations. At present, the association of carpal tunnel syndrome with hand activities remains unproved. It may be that with CTS as with many of the other medical and legal issues of our time, "litigation, fear, bias, and greed interfere with scientific efforts to answer questions of importance to the public health and that antiscientific social attitudes encourage premature or ill-informed political and legal solutions to medical questions."

Exh. K at p. 105-106 (citation omitted). The defendant asks the Court to reach the same conclusion in this case by striking the plaintiff's experts.

**3.     The Expert's Opinions Are Not Based On "Sufficient Facts or Data"
Or Principles and Methods Which Have Been Applied Reliably To
This Case:**

Even if the plaintiff's experts are allowed to testify that occupational activities can

cause repetitive stress illnesses, their opinions are nevertheless inadmissible because they

are not based on "sufficient facts or data" specific to this case nor have they applied any

"principles and methods reliably to the facts of" this case.  Courts have consistently

excluded experts in repetitive stress cases where their opinions are not based on sufficient

facts or data due to the expert's failure to adequately investigate the plaintiff's actual

work history, personal risk factors and potential other causes.[12]  The plaintiff's experts

here have failed to fulfill these requirements.

Simply put, Dr. Jupiter's "opinion"  on causation is deficient on its face and

should be summarily excluded.  He does not even attempt to describe

---

[12] *See* Dukes, 934 F. Supp. 939 (expert physician precluded where his opinions that the plaintiff's carpal
tunnel syndrome was work-related were reached by "talking with the plaintiff and reviewing information;"
the expert performed no independent studies nor received any research in reaching those conclusions nor
could he articulate any technique by which his conclusions could be scientifically and objectively tested);
Bennett v. PRC Public Sector, Inc., 931 F. Supp. 484 (S.D. Tex. 1996)(ergonomist precluded from offering
opinions that plaintiffs' upper extremity disorder was caused by defendant's computer system where expert
did not meet or interview plaintiffs, did not analyze potential work-related causes, did not know quantity of
keystroking per day, forces involved or breaks available throughout day, did not know when and for how
long plaintiffs used equipment, did not consider personal risk factors, did not investigate personal work or
medical histories, did not interview physicians, made no attempt to exclude other causes, made no attempt
to study the statistical frequency of upper extremity disorders in the particular work force or compare it
with other groups); Reiff v. Convergent Technologies, 1997 WL 93750 (D.N.J. 1997) (plaintiffs' expert
ergonomist and physician testimony did not meet Daubert standards for "sound" methodology); Dennis v.
Pertec Computer Corporation, 92 F. Supp. 156 (D.N.J. 1996) (first ergonomist opinion excluded where he
could not define methodology beyond stating that "certain factors were probably in the back of my mind;"
second ergonomist excluded where he failed to consider type of keyboard used by plaintiffs or maintenance
and repair of those keyboards as well as inability to describe methods used on a "representative" keyboard;
Spears v. Unisys Corporation, 1995 U.S.Dist. Lexis 8745 (E.D. Mich. 1995) (plaintiff's ergonomist barred
from offering opinions on causation in carpal tunnel case as he did not test his opinions, did not subject
them to peer review and based his opinions on "minimal factual investigation"); Claar, 29 F.3d 499 (where,
through affidavits, physicians offered their conclusions that the plaintiff's injuries were caused by exposure
to chemicals, the Ninth Circuit affirmed the trial court finding that the affidavits were inadmissible as they
failed to explain the basis for the opinions and the doctors' reasoning and methods in reaching them).

any basis for his "opinion" that the plaintiff's work activities "precipitated" his arthritis. He fails to identify the plaintiff's specific job activities or indicate that he is even familiar with the plaintiff's job activities. There is no indication that he ever even observed the plaintiff's work activities. Nor does he mention any specific quantifications or measurements of the physical activities the plaintiff performed in any of his jobs. Dr. Jupiter fails to even identify the specific ergonomic "risk factors" or state that any of them were present in any of the plaintiff's jobs. He also fails to describe any methodology by which he reached his conclusions.

Dr. Jupiter makes a legally impermissible leap by simply concluding without any scientific analysis or data, without any reliable methods or principles, and without applying any principles to the facts of this case, that the plaintiff's job activities "precipitated" his arthritis. This is the precise type of scientific conclusion that Daubert intended to preclude: a medical opinion as to causation based merely upon the "ipse dixit" of the expert. Accordingly, since this "opinion" fails to meet the requirements of Daubert and Rule 702, Dr. Jupiter's testimony on this issue must be excluded.

Mr. Andres must face the same fate. Although (because the plaintiff has failed to produce a report from Mr. Andres) it is unclear precisely what his testimony will be here, in a similar case, Pretter v. Metro North Commuter R.R. Co., Judge Rakoff of the U.S.D.C. for the Southern District of New York, recently precluded Dr. Andres from testifying to opinions similar to those he is expected to proffer in the case at hand. 206

F.Supp.2d 601 (2002).[13] In rejecting Dr. Andres' "medical causation" opinion, Judge

Rakoff ruled that:

> (the) opinion suffers from...fundamental flaws that render it inadmissible under
> *Daubert*...in its stated form the opinion is so vague as to be meaningless. What
> does it mean for a job to "expose" a worker to sufficient amounts of ergonomic
> risk factors to be "consistent" with the development of CTS? More
> fundamentally,...this vagueness is not the result of imprecise wording, but of
> imprecise methodology and inadequate investigation. For example, even
> though...Dr. Andres testified that the two "ergonomic risk factors" most
> applicable to plaintiff's work were frequent repetitions and the exertion of high
> levels of force, he neither defined these factors with specificity nor offered any
> objectively measured evidence of the frequency with which Metro North
> employees repeated their job functions or the level of force they
> employed....Instead he chose to rely on impressions and extrapolations derived
> from his brief and casual inspection and videotaping of the work functions at
> issue...substantially closer observation and quantitative measurement would be
> necessary before his opinion...could meet the most elementary requirements of
> "scientific certainty," such as precision, reliability, and falsifiability.

Pretter, 206 F.Supp.2d at 603-604, *citing* Daubert, 509 U.S. at 591-95, 113 S. Ct. 2786.

Noting Dr. Andres himself acknowledged that reliance on subjective "data" is

problematic in reaching "scientific" conclusions, Judge Rakoff also determined that the

deficiencies in Dr. Andres' methodology were:

> exacerbated, rather than cured, by the only "empirical" data on which (he) relied,
> to wit, plaintiffs' own vague, conclusory, and self-serving statements....One who
> seeks to clothe his opinions in the garb of "scientific certainty" must adhere to the
> strict standards of objectivity that the formal wear entails.

Id. at 604.

In the case at hand, Dr. Andres has been denied access to the plaintiff's jobsite

and has therefore not made any observations of the plaintiff's job activities. He has failed

to measure any of the physical factors associated with these activities, such as force,

---

[13] Pretter involved fifteen plaintiffs who filed FELA actions against the Metro North for allegedly work-related CTS. 206 F. Supp. at 602. Dr. Andres submitted a Report detailing several opinions. The Report, the conclusions and opinions expressed therein and the methods Dr. Andres employed in Pretter were all virtually the same as in the case at hand. Id.

repetition or posture. He therefore has again (as was the case in <u>Pretter</u>) failed to take any

quantitative measurements of the "risk factors." He also has been rendered unable to

conduct a detailed analysis or use any methodology that can be tested or subjected to peer

review and publication. As a result, Mr. Andres simply cannot apply any scientific

method to arrive at an opinion on causation in this case. Thus, his testimony should be

excluded.

      **WHEREFORE**, for all of the above-stated reasons, *National Railroad Passenger*

*Corporation's Motion In Limine To Preclude The Testimony Of The Plaintiff's Expert*

*Witnesses* should be allowed.

## <u>REQUEST FOR HEARING</u>

      In accordance with Local Rule 7.1(D), the defendant believes that oral argument,

if necessary, may assist the Court and wishes to be heard and therefore requests that the

Court schedule a hearing on its *Motion*.

Respectfully submitted,
National Railroad Passenger
Corporation,
By its attorneys,

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served a copy of the foregoing
pleading on all parties by hand/mail delivering same, to
all counsel of record.
Signed under the pains and penalties of perjury.

**DATED** _____12/30/05_____

Michael B. Flynn, BBO #559023
John E. Young, BBO #654093
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive
Suite 200
Quincy, MA 02169
(617) 773-5500
(617) 773-5510 (facsimile)

DATED: <u>December 30, 2005</u>

G:\F & A\CASE FILES\AMTRAK\occupational\DiBenedetto\Trial\MIL to exclude pl's experts.doc

# EXHIBIT A

**JOSEPH DIBENEDETTO**
**MGH: 093-63-99**
**August 20, 1999**



**Diagnosis:** epithelioid spindle cell hemangioma right upper extremity.
**Status-post:** resection of tumor and right axillary artery aneurysm 11/95; right lateral epicondylitis; history of DVT.

Mr. DiBenedetto has had a one week history of pain in his right arm, which is quite severe. It is aggravated with activities like swinging a hammer. He does not know what brought this on and does not recall any injury. He is concerned because this is the area of his prior tumor.

On examination he has no tenderness to palpation in his right deltoid area. He has full range of motion but has some pain with getting his arm behind his back and resistive motions of his hand and wrist cause pain. He is neurologically intact to light sensation and all major motor groups in the upper extremities are 5/5, although he has some pain when attempting to perform these maneuvers.

Repeat radiographs show no new bony abnormalities or soft tissue masses that I can see.

**Impression/Plan:** I suspect that this is an overuse type of syndrome and is unrelated to his tumor but in light of his tumor history I think we should repeat an MRI. It sounds like his symptoms are significant enough that he needs to rest this and take some anti-inflammatory agents. I will give him a note saying that he will need to be out of work for about ten days until we have a chance to review the MRI.

**Mark C. Gebhardt, M.D.**

ADDENDUM: He did meet with Dr. Siliski and according to the patient a high tibial osteotomy was recommended for medial joint line arthritis. This sounds very reasonable and I think if he wants to go ahead with that he can set that up with Dr. Siliski.

MCG:nb
cc:
Carl Danielson, M.D.
20 Porter Street
Melrose, MA 02176

Bruce Wadrouns, M.D.
300 Quannapowitt Parkway
Wakefield, MA 01880

Ira Spiro, M.D./Radiation Oncology
Glenn LaMurglia, M.D./MGH Vascular Surgery
John Siliski, M.D./MGH

12

# EXHIBIT B

1

```
1                    VOLUME I
                     PAGES 1-263
2                    EXHIBITS 1-14

3

4              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
5
                    CIVIL ACTION NO.
6                    04-10570-RCL

7

8        *****************************
         JOSEPH J. DIBENEDETTO,      *
9                PLAINTIFF,          *
                                     *
10           -VS-                    *
                                     *
11       NATIONAL RAILROAD PASSENGER *
         CORPORATION,                *
12               DEFENDANT.          *
         *****************************
13

14

15          Deposition of JOSEPH J. DIBENEDETTO, taken
         on behalf of the Defendant, pursuant to Notice
16       under the Rules of Civil Procedure, before Daryll
         Palma Watts, a Professional Court Reporter and
17       Notary Public, in and for the Commonwealth of
         Massachusetts, at the offices of FLYNN &
18       ASSOCIATES,P.C., 400 Crown Colony Drive, Quincy,
         Massachusetts, on Wednesday, December 07, 2005,
19       commencing at 10:13 a.m.

20

21

22            BEACON HILL COURT REPORTING, INC.
                    44 BAYSWATER STREET
23               BOSTON, MASSACHUSETTS 02128
                       617-569-8050
24
```

BEACON HILL COURT REPORTING, INC.
617-569-8050

---

2

```
1    APPEARANCES:

2

3

4    DON P. PALERMO, ESQUIRE
       HANNON & JOYCE LAW OFFICES
5      Public Ledger Building - Suite 1000
       150 South Independence Mall West
6      Philadelphia, Pennsylvania 19106-3413
       Counsel for:  The Plaintiff.
7

8    MICHAEL B. FLYNN, ESQUIRE
       FLYNN & ASSOCIATES, P.C.
9      400 Crown Colony Drive
       Quincy, Massachusetts 02169
10     Counsel for:  The Defendant.

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

BEACON HILL COURT REPORTING, INC.
617-569-8050

---

3

```
1                    I N D E X

2    Witness          Direct Cross Redirect

3    JOSEPH DiBENEDETTO

4    By Mr. Flynn              6

5

6

7                  E X H I B I T S
```

| Id. | Description | Page |
|-----|-------------|------|
| 1 | Plaintiff's Answers To Defendant's Interrogatories | 176 |
| 2 | Massachusetts General Hospital Correspondence dated October 10, 2005 | 197 |
| 3 | Complaint | 198 |
| 4 | Seth Krum, D.O. Correspondence dated June 03, 2002 | 201 |
| 5 | Massachusetts General Hospital Radiological Consultation | 202 |
| 6 | Massachusetts General Hospital Office Note | 206 |
| 7 | Massachusetts General Hospital Radiological Consultation | 206 |
| 8 | Massachusetts General Hospital Office Note dated March 27, 2001 | 206 |
| 9 | Massachusetts General Hospital Document dated August 20, 1999 | 207 |
| 10 | Massachusetts General Hospital Document | 207 |
| 11 | Application For Sickness Benefits | 221 |

BEACON HILL COURT REPORTING, INC.
617-569-8050

---

4

| Id. | Description | Page |
|-----|-------------|------|
| 12 | Application For Sickness Benefits | 226 |
| 13 | Massachusetts General Hospital Nursing Assessment Form | 230 |
| 14 | Massachusetts General Hospital Orthopedics Clinic Note | 240 |

BEACON HILL COURT REPORTING, INC.
617-569-8050

49

1  Q   Where your humerus comes in to the underside of
2      the shoulder?
3  A   Correct.
   Q   You've had several of these removed, correct?
   A   I had surgery to remove the brachial tumor.
6  Q   Right.  I think that was in '95?
7  A   Quite possible.
8  Q   At Mass. General?
9  A   Yes.
10 Q   Okay.  Go ahead.
11 A   Dr. LaMurglia I believe on that one.
12 Q   That surgery had a complication, that being a
13     thrombosis in your left leg?
14 A   Yes.  Actually I did get one right after that.
15 Q   You've since been treated with blood thinners,
16     Coumadin, correct?
17 A   Yes.
18 Q   You still take those, correct?
19 A   Yes, I do.
20 Q   Actually that impacts your ability to take
21     antiinflammatories, correct?
22 A   I'm on Celebrex.
23 Q   That's an antiinflammatory?
24 A   Well it's -- I don't remember the exact class of

BEACON HILL COURT REPORTING, INC.
617-569-8050

50

1      drug it's called.
2  Q   But you do remember your doctors cautioning you
3      with respect to antiinflammatories because they
4      interact with the Coumadin, correct?
5  A   I've been told not to take 'em too often.  You
6      know, not to not take 'em, but not to take 'em
7      often.
8  Q   When was the last time you developed a
9      Hemangioendothelioma in your upper arm?
10 A   It was -- I'm trying to think.  I don't remember
11     the exact timing, but I had a procedure done with
12     laser that basically zapped 'em.
13 Q   When was that?
14 A   Around that same time.
15 Q   Has it recurred since?
16 A   No.
17 Q   Getting back to these symptoms that you were
18     having.
19         Did you begin to experience symptoms in your
20     right wrist at any point before December of 2000?
21 A   I don't believe so.
22 Q   You said that they were, you said they were
23     brought on, correct me if I'm wrong, but I think
24     you mentioned that, something about a hammer?

BEACON HILL COURT REPORTING, INC.
617-569-8050

51

1  A   Yes.  I was carrying at work a two-pile sledge to
2      sledgehammer to knock in cables and change brake
3      shoes and, you know, we use it quite often.  We
4      carry it around with us.
5  Q   Sure.  Do you have a tool belt or something like
6      that?
7  A   No.  We carry it in our hand.
8  Q   You just carry the hammer in your hand?
9  A   Yes.
10 Q   It was when you were using that hammer that you
11     felt the pain in your right wrist?
12 A   I noticed it a lot hammering in 480 cables, 480
13     volt cables.
14 Q   That was about December of 2000?
15 A   Well, you know, over the years -- what's the word
16     I can use here.  You know, I've had -- I didn't
17     have constant pain but I tweaked it maybe --
18 Q   When?
19 A   I'm trying -- I don't remember the exact.  You
20     know, I've never put 'em in exact dates.
21 Q   Could it have been as early as August of 1999?
22 A   I'm not sure.
23 Q   As I understand it, you had been using this
24     hammer for several years prior to December of

BEACON HILL COURT REPORTING, INC.
617-569-8050

52

1      2000, correct?
2  A   Yes.
3  Q   As a matter of fact, you've had it since you
4      became a Carman, correct?
5  A   Yes.
6  Q   We're going to get to your job a little bit
7      later.  You became a Carman back in, what, '87?
8  A   That sounds about right.
9  Q   So for about 13 years prior to December of 2000,
10     right?
11 A   Yes.
12 Q   Now you've said that there were times where you
13     tweaked your right wrist, right?
14 A   Yes.
15 Q   When do you think the first time was that you
16     tweaked your right wrist?
17 A   I'm having a hard time.  You know, I don't have
18     specific dates so I'd be guessing.
19 Q   Well I don't want you to guess.  Just give me
20     your best estimate.
21         MR. PALERMO:  Just a quick objection.  He
22     doesn't know.  You're not going to blow the
23     statute on this.  He didn't get the symptoms
24     until, he already testified --

BEACON HILL COURT REPORTING, INC.
617-569-8050

53

1       MR. FLYNN: Don't coach him.

2       MR. PALERMO: I'm not -- five, six months

3   before --

        MR. FLYNN: Hold on. Hold on.

        MR. PALERMO: He described it --

6       MR. FLYNN: You could object. But to bring

7   in the statute that's a blatant attempt to coach

8   this witness and he has said --

9       MR. PALERMO: You're making a blatant --

10      MR. FLYNN: Hold on. He has said --

11      MR. PALERMO: Now, listen, you're making a

12  blatant attempt to get him to say tweaking --

13      MR. FLYNN: No. He said tweaking.

14      MR. PALERMO: You went right to August '99.

15  Where did you pull that from? That's three

16  months before this complaint was filed.

17      MR. FLYNN: He, he said tweaking

18  spontaneously. It's his words and I'm just

19  asking him.

20      MR. PALERMO: And he just said I didn't have

21  any dates.

22      MR. FLYNN: No. He said he doesn't want to

23  guess.

24  Q   So what's your best estimate --

                BEACON HILL COURT REPORTING, INC.

                        617-569-8050

54

1       MR. PALERMO: One more shot at this.

2       MR. FLYNN: I'll take as many shots as I

3   need to.

4   Q   Sir, what's your best estimate as to when you

5       first tweaked your right wrist?

6   A   I don't have a best estimate.

7   Q   Was it months after you started using that

8       hammer --

9   A   I'd be guessing.

10  Q   -- or years?

11  A   Probably years.

12  Q   Do you remember how many years?

13  A   No.

14  Q   How many times prior to December 2000 had you

15      tweaked your right wrist?

16  A   I don't remember.

17  Q   When you use the term tweaked your right wrist

18      what did you mean by that?

19  A   You know, you'd hit it, you'd hit the cable and

20      feel, you know, a little jolt.

21  Q   You'd feel some pain in your wrist?

    A   Yes.

23  Q   Would you experience numbness and tingling with

24      that when you tweaked it?

                BEACON HILL COURT REPORTING, INC.

                        617-569-8050

55

1   A   Sometimes I did. Best I can recall.

2   Q   Would it go up your radius like you've described

3       earlier?

4   A   I don't remember it doing that though.

5   Q   That would be as a result of your hammer banging

6       on something, correct?

7   A   Yes.

8   Q   How many times prior to December of 2000 had you

9       experienced that tweaking?

10  A   I don't recall.

11  Q   Was it more than once?

12  A   I don't recall at all.

13  Q   Was it more than a dozen times?

14  A   I don't recall.

15  Q   Have you always had the same shift since you

16      became a Carman?

17  A   No.

18  Q   It's been changed from time to time?

19  A   I've mostly been on midnight to eight.

20  Q   Midnight to eight?

21  A   Yes.

22  Q   Were you on midnight to eight in December of

23      2000?

24  A   I believe I was.

                BEACON HILL COURT REPORTING, INC.

                        617-569-8050

56

1   Q   For how long prior to that were you on the

2       midnight to eight shift?

3   A   Like I say, probably 95 percent of my time with

4       Amtrak has been on midnight to eight.

5   Q   That goes all the way back to '87?

6   A   Yes.

7   Q   When you first became a Carman?

8   A   Yes.

9   Q   What about as a car cleaner?

10  A   Mostly midnight to eight.

11  Q   As I understand it, you were a car cleaner from

12      the time you started on the Railroad in '76 right

13      up until '87, correct?

14  A   Correct.

15  Q   That's a different job than Carman, right?

16  A   Yes.

17  Q   So throughout your entire time on the Railroad 95

18      percent of the time you've been on that midnight

19      to eight shift, correct?

20  A   Correct.

21  Q   What's your routine been like? Has it been that

22      you would come home and go right to sleep, or

23      would you hang around and sleep right before you

24      went to work? How did that work?

                BEACON HILL COURT REPORTING, INC.

                        617-569-8050

193

1    hammering that's when you started to feel these
2    symptoms in your wrist?
3  A  Well I noticed it more after the first surgery.
     It was definitely something --
   Q  Do you agree with me, sir, that earlier in this
6    deposition under oath you told me that you first
7    started to recognize the symptoms in December of
8    2000, about six months before you saw Dr. Jupiter
9    because when you were hammering at work you were
10   feeling pain, numbness and tingling in your
11   wrist?  You told us that earlier, didn't you?
12 A  I'm not sure.
13 Q  You don't remember now?
14 A  No.  I'm not sure if I did say that.
15 Q  Well you certainly knew that --
16 A  It's been a long day already.
17 Q  I understand that.  But you went to see Dr.
18   Jupiter because you were having that pain in your
19   wrist, right?
20 A  Yes.
21 Q  That was being brought about by hammering, was it
22   not?
23 A  I'm sure it was.
24 Q  So you knew that by the time you had the first

                BEACON HILL COURT REPORTING, INC.
                        617-569-8050

194

1    surgery, correct?
2  A  I'm sure it had something to do with it.
3  Q  Even though that was how you felt about things in
4    your mind when you put in for the R.R.B. benefits
5    you did not put in as work-related, correct?
6  A  Because I was looking at it as a traumatic -- you
7    know, I look at an on-the-job injury as one
8    traumatic event.  I didn't think of a repetitive
9    event.  I was thinking, okay, I didn't really
10   have an accident one period of time that I says I
11   got it in this accident.
12 Q  You went back to work after about six months
13   following the first surgery, right?
14 A  Yes.
15 Q  In that interim you had some physical therapy,
16   right?
17 A  Yes.
18 Q  Then you went back to work, right?
19 A  Yes.
20 Q  Then after a few months it started to bother you
21   again?
   A  It was still bothering me during physical
23   therapy, of course.
24 Q  Then you went back to see Dr. Jupiter and he said

                BEACON HILL COURT REPORTING, INC.
                        617-569-8050

195

1    it's progressed, right?
2  A  Yes.
3  Q  He was calling it arthritis, correct?
4  A  I don't remember what he was calling it.
5  Q  You've looked at his reports, right?
6  A  Yeah, but I don't remember everything that's on
7    the reports.  I have a terrible memory as it is.
8  Q  But you've been to a lot of doctors and you've
9    communicated with a lot of doctors, right?
10 A  But that doesn't make me a medical person.
11 Q  I understand that.
12 A  I could read a report, but I don't understand
13   everything that's in that report.
14 Q  You've read the reports and you know that Dr.
15   Jupiter has described your condition as
16   arthritis, correct?
17 A  I don't remember that.
18 Q  Well he's never used the term Carpal Tunnel
19   Syndrome, has he?
20 A  I don't know if he is.
21 Q  Well do you know if he has or not?
22 A  I don't know if he has.
23 Q  Do you know of any doctor in your case who's ever
24   described the condition in your right wrist as

                BEACON HILL COURT REPORTING, INC.
                        617-569-8050

196

1    Carpal Tunnel Syndrome?
2  A  I don't remember that exact phrase being used.  I
3    know the word carpectomy so I'm assuming that has
4    something to do with Carpal --
5  Q  Have you seen a report with respect to your
6    condition of your right wrist that describes that
7    condition as Carpal Tunnel Syndrome?
8  A  I don't remember seeing anything.
9  Q  Would you agree with that -- I mean, I've got
10   thousands of pages of records and would you agree
11   with me that the words Carpal Tunnel Syndrome do
12   not appear in those records?
13       MR. PALERMO:  Objection.  Objection.  Real
14   quick.  Wait.  How does he know what you have?
15 Q  Do they appear in Dr. Jupiter's records at all?
16 A  I don't know.
17 Q  As far as you're sit here today you can't
18   remember seeing the words Carpal Tunnel Syndrome?
19 A  I have office notes.  I don't know what's in my,
20   you know, big file.  I might have a quick
21   paragraph or something saying what a nice guy I
22   am.  You know, he's very light on his office
23   notes.
24 Q  Has any doctor ever told you that the condition

                BEACON HILL COURT REPORTING, INC.
                        617-569-8050

197

```
 1      that you have is Carpal Tunnel Syndrome?
 2  A   I don't remember those words being used.
 3          MR. FLYNN:  Let me mark Dr. Jupiter's
 4      October 10, 2005 report as Exhibit.
 5              ( Massachusetts General Hospital
 6              Correspondence dated October 10,
 7              2005, marked as Exhibit No. 2.)
 8  Q   Now this is the report that you say you've seen,
 9      right, Dr. Jupiter's report in this case?
10  A   Yes.
11  Q   Do you see the last paragraph, In summary, Mr.
12      DiBenedetto had been evaluated and treated for
13      intercarpal arthritis of his right dominant
14      wrist.  Did I read that correctly?
15  A   Yes.
16  Q   Do you recall the words Carpal Tunnel Syndrome
17      being used in this report anywhere?
18  A   I haven't read that in quite a while so I don't
19      really remember most of the stuff that's on
20      there.
21  Q   You didn't read this in preparation for today's
22      deposition?
23  A   No, I didn't.
24  Q   Did you read anything in preparation for today's
```
BEACON HILL COURT REPORTING, INC.
617-569-8050

198

```
 1      deposition?
 2  A   No, I haven't.
 3  Q   But as far as you sit there today, you can't
 4      recall any doctor ever telling you what you have
 5      is Carpal Tunnel Syndrome, correct?
 6  A   I don't recall.  I don't recall them saying it,
 7      no.
 8  Q   Let me show you your Complaint.
 9          MR. FLYNN:  We'll mark this as Exhibit 3.
10              ( Complaint, marked as Exhibit No.
11              3.)
12  Q   Have you seen the Complaint before in this case,
13      sir, that was filed on your behalf?
14  A   Let me see it.  I don't know if I've actually
15      seen it.  I don't remember seeing this.
16  Q   But you know the process, right?
17  A   What process are you talking about?
18  Q   The process by which you file an F.E.L.A. claim
19      and the process by which you file a lawsuit for
20      your F.E.L.A. injuries, correct?
21  A   I don't know all --
22  Q   Well you negotiated settlement for your own claim
23      a couple of years ago, right?
24  A   Yes.
```
BEACON HILL COURT REPORTING, INC.
617-569-8050

199

```
 1  Q   And in another claim earlier than that you had
 2      been represented by counsel, correct?
 3  A   Correct.
 4  Q   And deposed, right?
 5  A   You mean against somebody else?
 6  Q   Right.
 7  A   Right.
 8  Q   Both those cases were against Amtrak, right?
 9  A   Yes.
10  Q   As your employer under the F.E.L.A.?
11  A   Yes.
12  Q   You knew that to file a claim you had to speak to
13      a claim agent, correct?
14  A   Did I speak to a claim -- I think once I got a
15      lawyer I couldn't speak to a claim agent.
16  Q   You understood to get a lawyer you had to sue to
17      get the --
18  A   Right, to get back the money that I've lost.
19  Q   You knew that part of that was filing a
20      Complaint, correct?
21  A   Yes.
22  Q   Here's the Complaint in this case and the
23      allegation is, Paragraph 10 on Page 4, As a
24      direct result of the defendant's negligence
```
BEACON HILL COURT REPORTING, INC.
617-569-8050

200

```
 1      through its agents, servants, workmen and/or
 2      employees the plaintiff suffered occupational
 3      Carpal Tunnel Syndrome, end of quote.  Did I read
 4      that correctly?
 5  A   Yes, you did.
 6  Q   The phrase here is not arthritis, is it?
 7  A   No, I don't see the word.
 8  Q   It's Carpal Tunnel Syndrome, right?
 9  A   Yes.
10  Q   As you sit here today you don't know of any
11      doctor who's ever told you or written a report
12      that you have Carpal Tunnel Syndrome, correct?
13  A   It could be in a report.  I don't know what
14      they've written on all the reports.
15  Q   But as we sit here today you don't know of any
16      doctor who has told you or written a report that
17      says you have Carpal Tunnel Syndrome, correct?
18  A   I haven't read all the reports so I can't answer
19      that question.
20  Q   No, I'm saying:  given that you haven't read them
21      just as you sit there today you don't know of any
22      doctor who's told you or written in a report that
23      you know of that you have Carpal Tunnel Syndrome,
24      correct?
```
BEACON HILL COURT REPORTING, INC.
617-569-8050

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**Boston Division**

JOSEPH J. DIBENEDETTO                 :
27 Western Avenue                     :
Wakefield, MA 01880                   :
                                      :
                Plaintiff             :
                                      :
    vs.                               :
                                      :    JURY TRIAL DEMANDED
NATIONAL RAILROAD                     :
PASSENGER CORPORATION                 :
253 Summer Street                     :
Boston, MA 02210                      :
                                      :
                Defendant             :    NO.

04 10570 RCL

MAGISTRATE JUDGE *Dein*

RECEIPT # *54960*
AMOUNT $ *150*
SUMMONS ISSUED *yes*
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. *T.W.*
DATE *2/03/04*

## CIVIL ACTION

1.     The Plaintiff, Joseph DiBenedetto, is a competent adult individual residing at 27 Western Avenue, Wakefield, Massachusetts 01880.

2.     The Defendant, National Railroad Passenger Corporation is a corporation organized and existing under the laws of the District of Columbia, doing business at and whose address for service of process is 253 Summer Street, Boston, Massachusetts 02210.

3.     This suit is brought pursuant to an Act of Congress known as the Federal Employers' Liability Act (F.E.L.A.), 45 U.S.C. §§51-60; the Federal Safety Appliance Acts, 45 U.S.C.§§1-16; and the Boiler Inspection Acts, 45 U.S.C.§§22-34.

4.     At all times material hereto, the Defendant, National Railroad Passenger Corporation, was engaged in interstate commerce as a common carrier by railroad operating a line and system of railroads in the State of Massachusetts and other states of the United States.

5.     At the time and place hereinafter mentioned, the acts of omission and commission causing injuries to the Plaintiff was done by the Defendant, its agents, servants, workmen and/or employees acting in the course and scope of their employment with and under the direct and exclusive control of the Defendant.

6.     At the time and place hereinafter mentioned, the Plaintiff was employed by Defendant railroad and was acting in the scope of his employment by Defendant and was engaged in the furtherance of interstate commerce within the meaning of the F.E.L.A.

7.     All the property, equipment and operations involved in this occurrence hereinafter referred to were owned and/or under the direct and exclusive control of the Defendant, its agents, servants, workmen and/or employees.

8.     The Plaintiff has been employed by the Defendant from July 14, 1976 through and including the present as a carman, and, while working within the scope of his employment in and around Boston, Massachusetts, was exposed to occupational risk factors for carpal tunnel syndrome, including but not limited to repetition, force, vibration and awkward wrist posture.

9.     Plaintiff's injuries were caused in whole or in part by the negligence, carelessness and recklessness of the Defendant and its agents, servants, workmen and/or employees, acting within the scope of their employment, which negligence consisted of the following:

   a)   failure to provide the plaintiff with a safe place to work as required by the Federal Employers' Liability Act, 45 U.S.C. §§51-60; the Federal Safety Appliance 45 U.S.C. §§1-16; and the Boiler Inspection Acts, 45 U.S.C. §§22-34.

- 2 -

b)    failure to provide a timely and adequate ergonomic program designed to prevent occupational carpal tunnel syndrome;

c)    failure to comply with safety and operating rules and regulations of the Defendant;

d)    forcing the Plaintiff to work under hurried and/or awkward conditions;

e)    negligence of the Defendant's agents, servants, workmen and/or employees; and

f)    negligence at law; and

g)    otherwise failing to exercise due and adequate care under the circumstances including, but not limited to, a lack of adequate manpower.

10.    As a direct result of the Defendant's negligence, through its agents, servants, workmen and/or employees, the Plaintiff suffered occupational carpal tunnel syndrome.

11.    The Plaintiff was diagnosed with occupational carpal tunnel syndrome which required surgery.

12.    As a direct result of the Defendant's negligence, through its agents, servants, workmen and/or employees, the Plaintiff has been unable to attend to his usual duties and occupations, all of which caused substantial financial loss and all of which may and probably will continue in the future.

13.    As a direct result of the Defendant's negligence, through its agents, servants, workmen and/or employees, the Plaintiff has been and may continue to be required to receive and undergo medical treatment and medical care, including surgery, and has incurred

- 3 -

reasonable and necessary medical expenses, all of which may and probably will continue in the future.

14.    As a direct result of the Defendant's negligence, through its agents, servants, workmen and/or employees, the Plaintiff has sustained pain, suffering, inconvenience, stress and a loss of enjoyment of life and may continue to suffer same for an indefinite period of time in the future.

15.    The Defendant has a duty to provide a reasonably safe place to work. It had a non-delegable duty to insure that the Plaintiff had adequate qualified assistance to perform the functions of his work without unnecessary risk of injury to himself. The Defendant has a duty to provide a sufficient number of employees to perform assigned work, and its failure to provide adequate assistance can be a breach of its duty to provide a safe place for the Plaintiff to work, and will entitle the Plaintiff to a recovery against the Defendant if any such failure was a cause, in whole or in part, of the injuries claimed by the Plaintiff.

WHEREFORE, the Plaintiff demands judgment against the Defendants in an amount in excess of ONE HUNDRED FIFTY THOUSAND DOLLARS, ($150,000.00).

HANNON & JOYCE

Dated: 3/19/04

BY: _____
THOMAS J. JOYCE, III, ESQUIRE
The Public Ledger Building - Suite 1000
150 S. Independence Mall West
Philadelphia, PA 19106
(888) 222-3352
Attorney for Plaintiff

LAWSON & WEITZEN, LLP

_____
MICHAEL J. MCDEVITT, BBO #564720
88 Black Falcon Avenue, Suite 345
Boston, MA 02210
(617) 439-4990
Local Counsel for Plaintiff

Dated:

- 4 -

%JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Joseph J. DiBenedetto
27 Western Avenue
Wakefield, MA 01880

**(b)** County of Residence of First Listed Plaintiff **Middlesex**
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS**
National Railroad Passenger Corporation
253 Summer Street
Boston, MA 02210

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** HANNON & JOYCE
The Public Ledger Bldg. - Ste. 1000
150 S. Independence Mall West
Philadelphia, PA 19106
(215) 446-4460
Attorney for Plaintiff

LAWSON & WEITZEN LLP
88 Black Falcon Avenue
Suite 345
Boston, MA 02210
(617) 439-4990
Local Counsel for Plaintiff

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability ☒ | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | | | |

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**PERSONAL INJURY**
☐ 362 Personal Injury—Med. Malpractice
☐ 365 Personal Injury—Product Liability
☐ 368 Asbestos Personal Injury Product Liability
**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Federal Employers Liability Act 45 U.S.C. §§51-60 et seq.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 150,000
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE ____ DOCKET NUMBER ____

DATE 3/19/04
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT # ____ AMOUNT ____ APPLYING IFP ____ JUDGE ____ MAG. JUDGE ____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only) Joseph J. DiBenedetoo vs. National Railroad Passenger Corporation

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

    [ ]  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    [ ]  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
               740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.         for patent, trademark or copyright cases

    [X]  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
               315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
               380, 385, 450, 891.

    [ ]  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
               690, 810, 861-865, 870, 871, 875, 900.

    [ ]  V.    150, 152, 153.

3.  Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

    _____

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                                    YES [ ]    NO [X]

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)

                                                                    YES [ ]    NO [X]

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                                    YES [ ]    NO [X]

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                                    YES [ ]    NO [X]

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                                    YES [X]    NO [ ]

    A.  If yes, in which division do all of the non-governmental parties reside?

        Eastern Division  [X]      Central Division  [ ]      Western Division  [ ]

    B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division  [ ]      Central Division  [ ]      Western Division  [ ]

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                                                    YES [ ]    NO [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Thomas J. Joyce, III

ADDRESS The Public Ledger Bldg. - Ste. 1000 150 S. Independence Mall W. Philadelphia 19106

TELEPHONE NO.  (215) 446-4460

(Coversheetlocal.wpd - 10/17/02)

# EXHIBIT D

 **MASSACHUSETTS GENERAL HOSPITAL**

 **HARVARD MEDICAL SCHOOL**

Department of Orthopaedic Surgery
55 Fruit Street, YAW 2100
Boston, Massachusetts 02114

Tel: 617 726-5100, administrative office
617 726-8530, patient office
Fax: 617 724-8532
jjupiter1@partners.org

 **Jesse B. Jupiter, M.D.**
Director, Orthopaedic Hand Service
Hansjörg Wyss AO Professor
Harvard Medical School

October 10, 2005

DIBENEDETTO, JOSEPH J
MGH # 093-63-99

Mary Ann Kieney
c/o Hannon & Joyce Law Office
Public Ledger Building
Suite 1000
150 South Independence Mall West
Philadelphia, PA 19106-3413



Dear Ms. Kieney,

I initially saw Mr. DiBenedetto on March 27, 2001, for a pain in the radial side of his right wrist. He was referred by Dr. Mark Gebhardt, a colleague at the Massachusetts General Hospital. It was unclear whether or not there was an acute injury, but he was very active in his job with the railroad and had repetitive traumatic events.

I learned his past medical history was of importance and that he was on anticoagulations for a lower extremity venous problem, and medication for hypertension.

My initial examination demonstrated substantial discomfort over the radial styloid area of his right wrist.

Radiographs at that time showed a large spur arising off of the scaphoid bone, and what appeared to be a small avulsion off of the radial styloid.

The initial impression was that of localized arthrosis with an avulsion fracture, the date of which was unclear, off of the radial styloid.

On May 4, 2001, he underwent an excision of the spur off of the scaphoid and the radial styloid as well. We found at surgery a substantial loss of articular cartilage off of the scaphoid. Postoperatively, he underwent an organized rehabilitation program and regained a reasonable degree of grip strength, noting on October 2, 2001, his strength was 35 kilograms compared to 47 on the opposite, and pinch of 28 pounds compared to 34 pounds. He had regained his motion and felt capable of returning to work.

**PARTNERS.** HealthCare System Member

He continued, however, to have pain and swelling. A corticosteroid injection was given in the wrist in November 2001, and a splint prescribed.

Because of ongoing problems and advancing intercarpal arthritis, he underwent a proximal row carpectomy on February 4, 2002. At that time, a substantial degree of arthrosis was noted, as well as a massive amount of fluid and synovitis. There was no ligament noted between the scaphoid and lunate.

An organized rehabilitation program was constructed and he ultimately returned to work in September 2002.

He was seen again on August 5, 2004, noting that he was still working for the railroad, however, was developing more discomfort. There was on examination some crepitation in both radial and ulnar deviation, and x-rays continued to show the alignment postsurgical to be intact. A firmer splint was prescribed.

Mr. DiBenedetto returned May 10, 2005, still having occasional discomfort. At that time, his examination showed an extension of the wrist of 40 degrees, flexion of 25 degrees, radial and ulnar deviation of 10 degrees each. He had a grip strength of 90 pounds versus 120 on the opposite side, which was similar to an examination two years before. X-rays showed no advancing arthrosis. Mr. DiBenedetto was scheduled to return in one year.

In summary, Mr. Joseph D. DiBenedetto had been evaluated and treated for intercarpal arthritis of his right dominant wrist. The symptoms appear to be precipitated by events that occurred while in his employment. He presented initially with what appeared to a chip fracture off the radial styloid associated with intercarpal arthritis. He ultimately required two surgical procedures, and is left with a permanent partial disability of 20% of his dominant wrist. It is possible that he will require additional surgery in the future.

Thank you very much.

Sincerely yours,

Jesse Jupiter, M.D.
Jesse B. Jupiter, M.D.
Director Orthopaedic Hand Service
Massachusetts General Hospital
Hansjörg Wyss/AO Professor
Harvard Medical School

JJ/pm/mtb
DD: 10/10/05
DT: 10/10/05

# EXHIBIT E



# HANNON & JOYCE
### LAW OFFICES

PUBLIC LEDGER BUILDING, SUITE 1000
150 SOUTH INDEPENDENCE MALL WEST
PHILADELPHIA, PENNSYLVANIA 19106-3413
(215) 446-4460  ~  (888) 222-FELA (US)  ~  (215) 446-4479 (FAX)
hjmail@hannonandjoyce.com



DON P. PALERMO
d.palermo@hannonandjoyce.com

October 25, 2005

John E. Young, Esquire
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive
Suite 200
Quincy, MA  02169

RE:    Joseph J. DiBenedetto v. National Railroad Passenger Corporation
       U.S.D.C., Massachusetts (Boston), C.A. No.:  04-10570-RCL
       Our File Number:   X1-51593-K

Dear Mr. Young:

Enclosed please find the Military Records authorizations, which you previously forwarded me with regard to the above-referenced matter. In addition, as a supplement to Plaintiff's Answers to Defendant's Interrogatories, enclosed please find the expert narrative report of Jesse B. Jupiter, M.D. dated October 10, 2005.

Kindly contact me upon receipt of this letter to discuss the scheduling of the Plaintiff's deposition.

Thank you for your courtesy and cooperation.

Very truly yours,

DON P. PALERMO

DPP/kad
Enclosures

# EXHIBIT F

Paul J. Sahovey
MBTA Law Department
Ten Park Plaza
Transportation Building
Boston, MA 02116
617-222-3189
Fax: 617-222-3194
*TERMINATED: 06/24/2005*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/23/2004 | 1 | COMPLAINT against National Railroad Passenger Corporation Filing fee: $ 150, receipt number 54760, filed by Joseph DiBenedetto.(Tebo, Susan) (Entered: 03/24/2004) |
| 03/23/2004 | | Summons Issued as to National Railroad Passenger Corporation. (Tebo, Susan) (Entered: 03/24/2004) |
| 03/23/2004 | | If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Judith G. Dein. (Tebo, Susan) (Entered: 03/24/2004) |
| 03/29/2004 | 2 | SUMMONS Returned Executed National Railroad Passenger Corporation served on 3/29/2004, answer due 4/19/2004. (Smith3, Dianne) (Entered: 04/13/2004) |
| 04/16/2004 | 3 | ANSWER to Complaint with Jury Demand by National Railroad Passenger Corporation.(Stanhope, Don) (Entered: 04/21/2004) |
| 04/28/2004 | | ***Attorney Paul J. Sahovey for National Railroad Passenger Corporation added. (Hourihan, Lisa) (Entered: 04/28/2004) |
| 04/28/2004 | 4 | NOTICE of Scheduling Conference Scheduling Conference set for 6/3/2004 02:30 PM in Courtroom 11 before Judge Reginald C. Lindsay. (Hourihan, Lisa) (Entered: 04/28/2004) |
| 06/02/2004 | 5 | JOINT STATEMENT re scheduling conference. (Hourihan, Lisa) (Entered: 06/03/2004) |
| 06/02/2004 | 6 | Report of Parties' Planning Conference (Hourihan, Lisa) (Entered: 06/03/2004) |
| 06/03/2004 | | Electronic Clerk's Notes for proceedings held before Judge Reginald C. Lindsay : Scheduling Conference held on 6/3/2004. Automatic Disclosure due by 10/15/04. Amended Pleadings due by 7/2/2004.Fact Discovery due by 1/31/05. Plaintiff to disclose expert by 12/31/04. Defendant to disclose expert by 1/31/05. Discovery due by 2/27/2005. Joinder of Parties due by 7/2/2004. Motions due by 3/15/2005. (Court Reporter None Present.) (Hourihan, Lisa) (Entered: 06/08/2004) |
| 04/06/2005 | 7 | Judge Reginald C. Lindsay : ORDER entered. PROCEDURAL ORDER |

| | | |
|---|---|---|
| | | re pretrial/trial Final Pretrial Conference set for 6/9/2005 03:00 PM in Courtroom 11 before Judge Reginald C. Lindsay.(Hourihan, Lisa) (Entered: 04/06/2005) |
| 06/09/2005 | | Electronic Clerk's Notes for proceedings held before Judge Reginald C. Lindsay : Final Pretrial Conference held on 6/9/2005. Counsel report that they are not ready to proceed to pretrial. Court sets trial date for 9/19/05. Estimate 5-7 days. Counsel for the defendant to be substituted. No more discovery will be allowed in the case. Counsel may mediate the case but there will be not change in the trial date. (Court Reporter None Present.) (Hourihan, Lisa) (Entered: 06/09/2005) |
| 06/09/2005 | 8 | Judge Reginald C. Lindsay : ORDER entered. PROCEDURAL ORDER re pretrial/trial Final Pretrial Conference set for 9/1/2005 03:00 PM in Courtroom 11 before Judge Reginald C. Lindsay. Jury Trial set for 9/19/2005 09:00 AM in Courtroom 11 before Judge Reginald C. Lindsay. (Hourihan, Lisa) (Entered: 06/09/2005) |
| 06/22/2005 | 9 | NOTICE of Appearance by John E. Young on behalf of National Railroad Passenger Corporation (Young, John) (Entered: 06/22/2005) |
| 06/22/2005 | 10 | NOTICE of Appearance by Michael B. Flynn on behalf of National Railroad Passenger Corporation (Flynn, Michael) (Entered: 06/22/2005) |
| 06/24/2005 | 11 | NOTICE of Withdrawal of Appearance Attorney Paul J. Sahovey terminated. (Abaid, Kim) (Entered: 06/27/2005) |
| 07/12/2005 | 12 | MOTION for Discovery by National Railroad Passenger Corporation. (Young, John) (Entered: 07/12/2005) |
| 08/04/2005 | | Judge Reginald C. Lindsay : Electronic ORDER entered denying 12 Motion for Discovery and to Postpone the Trial (Hourihan, Lisa) (Entered: 08/04/2005) |
| 08/11/2005 | 13 | Emergency MOTION for Protective Order --*Assented To-- filed* by National Railroad Passenger Corporation.(Young, John) (Entered: 08/11/2005) |
| 08/22/2005 | | Judge Reginald C. Lindsay : Electronic ORDER entered granting 13 Motion for Protective Order (Hourihan, Lisa) (Entered: 08/22/2005) |
| 08/22/2005 | | Set/Reset Hearings: Jury Trial set for 1/23/2006 09:00 AM in Courtroom 11 before Judge Reginald C. Lindsay. Pretrial Conference set for 1/5/2006 03:00 PM in Courtroom 11 before Judge Reginald C. Lindsay. (Hourihan, Lisa) (Entered: 08/22/2005) |
| 11/17/2005 | 14 | MOTION for Leave to Appear Pro Hac Vice by Don P. Palermo by Joseph DiBenedetto. (Attachments: # 1 Supplement Cert, for Pro Hac Vice)(McDevitt, Michael) (Entered: 11/17/2005) |
| 11/17/2005 | 15 | Certificate of Good Standing re 14 MOTION for Leave to Appear Pro Hac Vice by Don P. Palermo by Joseph DiBenedetto. (McDevitt, Michael) (Entered: 11/17/2005) |
| | | |

| 12/01/2005 | 16 | MOTION to Enter Premises by Joseph DiBenedetto.(McDevitt, Michael) (Entered: 12/01/2005) |
| 12/14/2005 | 17 | Opposition re 16 MOTION to Enter Premises filed by National Railroad Passenger Corporation. (Young, John) (Entered: 12/14/2005) |
| 12/23/2005 | | Judge Reginald C. Lindsay : Electronic ORDER entered denying 16 Motion to Enter Premises. This motion, in the nature of a motion to compel further discovery, has been filed well after the deadline set by the court for the completion of discovery. (Lindsay, Reginald) (Entered: 12/23/2005) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/28/2005 15:10:56 | | |
| **PACER Login:** f10413 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** 1:04-cv-10570-RCL |
| **Billable Pages:** 2 | **Cost:** | 0.16 |

# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH J. DIBENEDETTO,
     Plaintiff,

vs.

NATIONAL RAILROAD PASSENGER
CORPORATION,
     Defendant.

CIVIL ACTION NO.: 04-10570-RCL

## NATIONAL RAILROAD PASSENGER CORPORATION'S MOTION FOR LEAVE TO CONDUCT DISCOVERY AND TO POSTPONE THE TRIAL DATE

The defendant, National Railroad Passenger Corporation ("AMTRAK"), hereby moves

this Honorable Court to allow AMTRAK to conduct limited discovery in this case and to

postpone the current trial date of September 19, 2005. As grounds therefore, the defendant states

as follows:

## I. FACTUAL BACKGROUND

On March 23, 2004, the plaintiff, Joseph DiBenedetto ("DiBenedetto") filed a *Complaint*

against AMTRAK.[1]  On April 16, 2004, Attorney Paul Sahovey, in-house counsel for the

Massachusetts Bay Transportation Authority ("MBTA"), filed an answer and affirmative

defenses on behalf of AMTRAK. AMTRAK has, up until recently, operated the commuter rail

service in and around Boston pursuant to various agreements with the MBTA. *See* Affidavit of

Rosa T. Richmond, a copy of which is attached as Exhibit "A." As such, many employees

worked for both AMTRAK and the MBTA at various times. Id. The amount of service time of

an injured employee determined which of the two entities would answer and defend against an

---

1 This case had previously been filed in the Philadelphia Court of Common Pleas in Pennsylvania. On October 1,
2003, this matter was dismissed from the Philadelphia Court of Common Pleas. The parties stipulated to a dismissal
in light of the defendant's Motion to Dismiss for Forum Non Conveniens and agreed that the plaintiff had until
March 25, 2004 to re-file his case in Massachusetts. In the Pennsylvania case, the defendant was represented by

injured employee's lawsuit. Id. The MBTA (Attorney Sahovey) appeared in this case for

AMTRAK because it was originally (and erroneously) believed that the plaintiff had worked

more for the MBTA than AMTRAK, thereby triggering the MBTA's obligation to defend. Id.

Since answering the plaintiff's Complaint and taking over the defense of this litigation, the

MBTA has conducted no discovery, except for serving written discovery. Notably, the plaintiff

has not been deposed and no expert witnesses have been disclosed.

     A pre-trial conference was held in this case on June 9, 2005, at which time the Court

stated that no discovery will be allowed in this case and that counsel may mediate the case but

there will not be a change in the trial date. Counsel for AMTRAK was substituted on June 22,

2005. AMTRAK respectfully requests that this Honorable Court allow substituted counsel the

opportunity to conduct limited discovery and postpone the trial date.

## II. ARGUMENT

     This Honorable Court should allow AMTRAK's *Motion For Leave To Conduct*

*Discovery And To Postpone The Trial Date* as AMTRAK, for all intents and purposes, is a new

party to this litigation. Exh. A. AMTRAK and the MBTA are separate and distinct entities with

differing interests, but have had a long history of business relationships. Id. Up until very

recently, AMTRAK operated the states' commuter rail service per various agreements with the

MBTA. Id. As a result, employees for both AMTRAK and the MBTA performed services for

both entities. Id. The amount of service an employee has performed for either entity determines

which entity will appear and defend against claims and lawsuits that such injured employees file

against them. Id. When the plaintiff's claim was originally filed, AMTRAK and the MBTA

believed that the plaintiff was in service for the MBTA and as a result, counsel for the MBTA

appeared and defended against the plaintiff's claims. Id. The plaintiff has actually performed services for both AMTRAK and the MBTA. Id.

AMTRAK has since discovered that the plaintiff served as an AMTRAK employee for a longer period of time than he did for the MBTA and as a result, AMTRAK is now the entity defending this matter. Exh. A. As a result, counsel for AMTRAK was substituted on June 22, 2005. Although named as the original defendant, for all intents and purposes the defendant AMTRAK is a new party to this litigation and should be allowed the opportunity to conduct limited discovery.

As an entity distinctly separate from the MBTA, AMTRAK utilizes its own litigation strategy and processes for defending claims. More importantly, AMTRAK's interests are different from that of the MBTA and it should be afforded an opportunity to adequately protect these interests. In light of these circumstances, it is necessary for AMTRAK to conduct limited discovery. Specifically, AMTRAK wishes to serve interrogatories and requests for documents upon the plaintiff, depose the plaintiff and any material or expert witnesses that the plaintiff may designate and prepare its own expert disclosures. It is worthy to note that Attorney Sahovey served interrogatories and requests for production of documents upon the plaintiff on April 14, 2004 but the plaintiff has never responded. A copy of these discovery requests are attached hereto as Exhibit "B."

It is apparent from the record that very little discovery has been conducted in this matter. However, it would be unfair and unjust to subject a new party such as AMTRAK to the Court's previous pre-trial order without an adequate opportunity to prepare for trial.

3

### III. CONCLUSION

The defendant AMTRAK hereby moves this Honorable Court to allow it to conduct limited discovery in this matter and to postpone the trial date. AMTRAK has not been afforded the opportunity to conduct discovery in this matter and without such opportunity, AMTRAK's interests would be irreversibly prejudiced at mediation and/or trial. In the interests of justice, AMTRAK should be afforded the opportunity to conduct limited discovery in this matter in order to be able to adequately prepare for trial.

**WHEREFORE**, for all of the above-stated reasons, *National Railroad Passenger Corporation's Motion For Leave To Conduct Discovery And To Postpone The Trial Date* should be allowed.

### REQUEST FOR HEARING

In accordance with Local Rule 7.1(D), the defendant believes that oral argument, if necessary, may assist the Court and wishes to be heard and therefore requests that the Court schedule a hearing on its *Motion*.

Respectfully submitted,
National Railroad Passenger Corporation,
By its attorneys,

John E. Young, BBO #654093
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive
Suite 200
Quincy, MA 02169
(617) 773-5500
(617) 773-5510 (facsimile)

4

## CERTIFICATION

In accordance with L. R. 7.1, I, John E. Young, Esq., certify that I have attempted, unsuccessfully, to confer with counsel for the plaintiff, Thomas Joyce, Esq., in order to resolve or narrow the issues in *National Railroad Passenger Corporation's Motion For Leave To Conduct Discovery And To Postpone The Trial Date*. *See* Affidavit of John E. Young, Esq., a copy of which is attached hereto as Exhibit "C."

John E. Young, Esq.

Dated: July 12, 2005

5

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH J. DIBENEDETTO,
      Plaintiff,

vs.

NATIONAL RAILROAD PASSENGER
CORPORATION,
      Defendants.

CIVIL ACTION NO.: 04-10570-RCL

## AFFIDAVIT OF ROSA T. RICHMOND

I, Rosa T. Richmond, do hereby swear and depose as follows:

1.    I am a Senior Claims Agent employed by AMTRAK;

2.    AMTRAK and the MBTA are separate and distinct entities but have a history of business relationships including AMTRAK's operation of the Commonwealth's commuter rail service;

3.    The plaintiff has performed services for both AMTRAK and the MBTA;

4.    The amount of service performed for either entity often determines which entity will appear and defend against the plaintiff's claims;

5.    When the plaintiff's claim was filed, it was originally believed that the plaintiff was in service for the MBTA and as a result, the MBTA appeared and defended against the plaintiff's claims;

6.    It has come to the attention of AMTRAK that the plaintiff served as an AMTRAK employee for a longer period of time than he did for the MBTA and as a result, AMTRAK is now the entity defending this matter.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _27_ DAY OF, JUNE 2005.


Rosa T. Richmond

1

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10570RCL

JOSEPH J. DIBENEDETTO,
West 3rd Avenue,
Worcester, MA 01602,
    Plaintiff,

v.

NATIONAL RAILROAD
PASSENGER CORPORATION,
... Station,
Boston, MA 02210,
    Defendant.

DEFENDANT AMTRAK'S FIRST
SET OF INTERROGATORIES TO
PLAINTIFF, JOSEPH J. DIBENEDETTO

Defendant, National Railroad Passenger Corporation ...

Amtrak ... propounds the following interrogatories ...

... under the ... the Federal Rules of Civil Procedure ...

... and ... Rule ... the Federal Rules of Civil Procedure ...

1. Please state your full name, age, current address, date of birth,
   social security number, marital status, educational
   background, and initial date of employment with Amtrak.

2. Please state the exact date, time and location where the
   accident occurred, the number of the particular coach
   involved and the location on the coach where the
   accident(s) as alleged in your Complaint occurred.

3. Please describe in full and complete detail the manner in
   which the accident(s) as alleged in your Complaint
   occurred, setting forth in chronological order all events
   which took place and all events which occurred prior to the time
   of and subsequent to the alleged accident.

4.  Please state the full name and title of your immediate supervisor at the time of the accident(s) as alleged in your Complaint.

5.  If you claim your injuries were caused by a dangerous or defective condition at any commuter rail station, commuter rail facility, a particular coach, or the general condition of the premises where you were working, please describe with particularity the alleged dangerous condition(s) or defect(s) which caused the alleged accident, giving an exact description with dimensions and other physical characteristics of the dangerous or defective condition, or of any materials on the premises which caused or contributed to cause the alleged accident.

    a.  Please set forth the number, or other identifying character of any materials, tools or appliances, the present location of same and the name and address of the owner of same, to the best of your knowledge.

    b.  Set forth all of your observations of the condition of the location of the alleged accident immediately before said accident, during and immediately after.

    c.  If the plaintiff claims the alleged accident resulted from the presence of any equipment, tools or materials not generally in the said area, please state your reasons for using said equipment, tools or materials on the date of the alleged accident and the work you were performing immediately prior to the alleged accident.

6.  Please state in full and complete detail each and every fact upon which you rely in alleging that the defendant, its agents, servants and/or employees, were negligent and failed to provide a safe place in which to work.

7.  Please state the names, addresses and relationship to you of any persons having knowledge of the facts alleged in your Complaint, detailing the specific facts of which said persons have knowledge.

8.  Please describe in full and complete detail all of the injuries you claim to have suffered as a result of the alleged accident in the Complaint and for which you seek to recover damages in this action.  Please state the specific

state the approximate date when you were fully recovered.

16.    If you have not recovered from the injuries you sustained
       as a result of the accident as alleged in your Complaint,
       please state your present condition in detail, designating
       the days of your [illegible] affected and the respect
       in which [illegible]

[illegible paragraph 17]

[illegible paragraph 18]

[illegible paragraph]

[illegible paragraph]

20.    [illegible] the identity of any person having knowledge of
       [illegible] persons having knowledge of relevant facts concerning
       the matters and issues in this case, [illegible] know, the
       last known address or location of said [illegible] and
       including any knowledge they may have concerning the [illegible]

21.    Please state all persons or firms by whom you have been
       employed during the past ten years, indicating the
       approximate dates of employment with each.

22. Please state the nature of your duties in each period of employment listed in your answer to the preceding interrogatory.

23. If you have ever been self-employed, please describe each period of self-employment by indicating the approximate dates, the nature of the work, and your approximate monthly earnings during each such employment.

24. If you know of any witnesses to the accident as alleged in your Complaint, please set forth the full name and address of each such witness and to the extent possible, what they know, observed and/or did in relation to the accident as alleged in your Complaint.

25. Identify each person whom Plaintiff intends to call as a witness at trial.

26. Identify each document upon which Plaintiff intends to rely at trial.

27. Identify each person whom Plaintiff intends to call as an expert witness and for each expert witness:

   a. State the substance of the opinion to which the witness is expected to testify; and
   b. Provide a summary for the grounds for each such opinion.

NATIONAL RAILROAD
PASSENGER CORPORATION,
By its attorney,

Paul J. Sahovey
c/o MBTA Law Department
Ten Park Plaza
Boston, MA  02116
(617)222-3189
BBO #437900

Dated:    April 14, 2004

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10570 RCL

JOSEPH J. DIBENEDETTO

REQUEST FOR PRODUCTION
OF DOCUMENTS TO PLAINTIFF
JOSEPH J. DIBENEDETTO

NATIONAL RAILROAD
PASSENGER CORPORATION

This demand is to include all after-acquired documents and things. The Plaintiff is, therefore, requested to supplement the production of documents and things by forwarding copies to the Defendant Amtrak or putting the Defendant on notice as to any newly acquired material.

## REQUESTS

1.   Copies of all signed and/or unsigned statements or statements recorded by mechanical and/or electronic means, made by the Plaintiff's representative to Defendant Amtrak, and/or insurance companies, which relate to the incident(s) referred to in the Complaint and which are in the possession, custody or control or available to the plaintiff.

2.   Copies of all signed and/or unsigned statements or statements recorded by mechanical and/or electronic means, made by any witnesses to the alleged accident(s), directly or indirectly, which are in the possession, custody or control of the Plaintiff or subject to his/her control.

3.   The names and addresses of all persons known to the Plaintiff who were witnesses, either directly or indirectly, to the accident(s) as alleged in your Complaint.

4.   Photographs or sketches, plans or diagrams, or copies thereof, of the scene of the accident(s) as alleged in your Complaint, the condition of the engine room of the locomotive and/or equipment involved in the accident together with any and all photographs which the Plaintiff intends to offer in evidence at the time of trial.

5.   Any and all work and wage records, including hourly rate of pay, for a period of ten (10) years prior to the date of each accident(s) as alleged in your Complaint.

6.   Any accident reports or other reports, either oral or in writing, filed either by the Plaintiff or on the Plaintiff's behalf by his attorney(s) or otherwise for the accident(s) as alleged in your Complaint.

7.   All medical, hospital or other reports, either written or oral, involving injuries or damages as alleged to have been suffered by the Plaintiff as a result of the accident(s) as alleged in your Complaint; also, any and all bills,

insurance company receipts of payment, together with all canceled checks, evidence of payment and/or cash receipts evidencing payment.

8.  All medical, hospital, or other reports, either written or oral, involving injury to Plaintiff for a period of three years prior to the date of the accident(s) as alleged in your Complaint and also any and all bills, insurance company reports of payment together with all canceled checks, evidence of payment and/or cash receipts evidencing payment.

9.  Copies of all state and federal income tax records and returns which the Plaintiff filed with the federal government, Commonwealth of Massachusetts and county of residence for a period of five (5) years prior to the date of the accident(s) as alleged in your Complaint.

10. Copies of all reports of all expert witnesses in the possession or custody of the Plaintiff or subject to plaintiff's control.

11. Copies of all documentary evidence to be used by the plaintiff at the trial of this action including but not limited to public records, if any.

12. Copies of any and all plans, diagrams or drawings of the area of the locomotive, engine room, commuter rail station, commuter rail facility, a particular coach, or the general area of the premises where you were working at the time of the accident(s) as alleged in your Complaint.

NATIONAL RAILROAD
PASSENGER CORPORATION,
By its attorney,

Paul J. Sahovey
c/o MBTA Law Department
Ten Park Plaza
Boston, MA  02116
(617)222-3189
BBO #437900

Dated:    April 14, 2004

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH J. DIBENEDETTO,
    Plaintiff,

vs.

NATIONAL RAILROAD PASSENGER
CORPORATION,
    Defendant.

CIVIL ACTION NO.: 04-10570-RCL

### AFFIDAVIT OF JOHN E. YOUNG, ESQ.

I, John E. Young, Esq., do hereby swear and depose as follows:

1. I am an attorney duly admitted to practice law in the Commonwealth of Massachusetts and I represent the defendant in the above-entitled matter;

2. On July 6, 2005, I contacted Attorney Michael McDevitt, Lawson & Weitzen, LLP, 88 Black Falcon Avenue, Boston, MA 02210, counsel who has appeared on behalf of the plaintiff, to discuss the issues raised in *National Railroad Passenger Corporation's Motion For Leave To Conduct Discovery And To Postpone The Trial Date*;

3. Attorney McDevitt stated that he is local counsel on this case and that I needed to speak with Attorney Thomas Joyce, 150 S. Independence Mall West, Philadelphia, PA 19106 in regards to this matter;

4. I called Attorney Joyce and left him a voice mail message on July 6, 2005;

5. I faxed Attorney Joyce a letter on July 7, 2005 requesting that he contact me to discuss this matter;

6. I called Attorney Joyce on July 11, 2005 and left a message with his assistant explaining my request to confer on this matter;

7. I have not heard from Attorney Joyce to date.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS $\underline{12}^{th}$ DAY OF, JULY 2005.

John E. Young, Esq.

2

## John Young

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **Sent:** | Thursday, August 04, 2005 8:02 AM |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 1:04-cv-10570-RCL DiBenedetto v. National Railroad Passenger Corporation "Order on Motion for Discovery" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### United States District Court

### District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Hourihan, Lisa entered on 8/4/2005 at 8:01 AM EDT and filed on 8/4/2005

| | |
|---|---|
| **Case Name:** | DiBenedetto v. National Railroad Passenger Corporation |
| **Case Number:** | 1:04-cv-10570 |
| **Filer:** | |
| **Document Number:** | |

**Docket Text:**
Judge Reginald C. Lindsay : Electronic ORDER entered denying [12] Motion for Discovery and to Postpone the Trial (Hourihan, Lisa)

The following document(s) are associated with this transaction:

**1:04-cv-10570 Notice will be electronically mailed to:**

Michael B. Flynn    mbflynn@flynnassoc.com

Michael J. McDevitt    mmcdevitt@lawson-weitzen.com, amazzarella@lawson-weitzen.com

John E. Young    jyoung@flynnassoc.com

**1:04-cv-10570 Notice will not be electronically mailed to:**

# EXHIBIT H

## John Young

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **Sent:** | Friday, December 23, 2005 10:11 AM |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 1:04-cv-10570-RCL DiBenedetto v. National Railroad Passenger Corporation "Order on Motion to Enter Premises" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### United States District Court

### District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Lindsay, Reginald entered on 12/23/2005 at 10:10 AM EST and filed on 12/23/2005

| | |
|---|---|
| **Case Name:** | DiBenedetto v. National Railroad Passenger Corporation |
| **Case Number:** | 1:04-cv-10570 |
| **Filer:** | |
| **Document Number:** | |

**Docket Text:**
Judge Reginald C. Lindsay : Electronic ORDER entered denying [16] Motion to Enter Premises. This motion, in the nature of a motion to compel further discovery, has been filed well after the deadline set by the court for the completion of discovery. (Lindsay, Reginald)

The following document(s) are associated with this transaction:

**1:04-cv-10570 Notice will be electronically mailed to:**

Michael B. Flynn    mbflynn@flynnassoc.com

Michael J. McDevitt    mmcdevitt@lawson-weitzen.com, amazzarella@lawson-weitzen.com

John E. Young    jyoung@flynnassoc.com

**1:04-cv-10570 Notice will not be electronically mailed to:**

# EXHIBIT I

# REPORT IN THE MATTERS OF BASHANT ET AL. V. METRO-NORTH COMMUTER RAILROAD

## February 12, 2001

### Robert O. Andres, Ph.D., CPE

## INTRODUCTION

This is a brief report summarizing my knowledge and opinions in the matters of Thomas Bashant, John Dmytryszyn, Joseph Geiss, George Johnson, Jr., Joseph Juhasz, John Male, Sr., Frank Mastranunzio, Jerry Patterson, Christopher Peck, Patrick Peters, Frank Pretter, Robert Richardson, William Strand, Gregory Stuckart, and Brian Tarpey versus the Metro-North Commuter Railroad (MNCR). The report provides two types of analyses: first, whether these employees were exposed to any ergonomic risk factors during their work with MNCR, and second, what manner of comprehensive safety and health program MNCR had in place to systematically deal with ergonomic issues for their workers.

My analysis of these employees' exposure to ergonomic risk factors will be based on information provided to me in this matter, information from the railroad and associated groups, a site inspection at Harmon Shop on 1/25/01, and previous observations I have made of similar work in other facilities. My evaluation of the actions of MNCR in regard to their treatment of ergonomics issues within their safety and health program will address when a responsible employer should have known about the ergonomic risk factors associated with work related musculoskeletal disorders (WMSDs) and what the responsible employer should have done to reduce risk by removing or reducing exposure to these risk factors. Finally, my conclusions and opinions are presented at the end of the report.

## INFORMATION PROVIDED AND REVIEWED

The following materials were provided by Mr. Joyce's office for my review:

*Pleadings:*

- Plaintiffs' Complaints (15)
- Plaintiff's Answers to Defendant's Interrogatories (15)
- Plaintiff's Answers to Defendant's Demand for Expert Witness Information (15)
- Defendant MNCR Answer to Plaintiff's Interrogatories in James Johnson v. MNCR, dated 7/7/00
- Response to Plaintiff's Requests for Production of Documents in James Johnson v. MNCR, dated 7/7/00

*Testimony:*

- Deposition testimony of Dr. Genevieve Go in Frank Pretter v. MNCR, taken 1/17/01

The concept of an ergonomic risk factor in the case of the upper extremity should be considered the same way it is considered for the development of heart disease. The more risk factors present in a given situation, the greater the risk to the individual. This is important since quantified dose-response information is not available. In the case of heart disease, if a person has a healthy diet, exercises appropriately, has no family history of heart disease, but smokes cigarettes they are at a certain level of risk. However, someone who has a lousy diet, is overweight and sedentary, has a family history of heart disease and also smokes is at a higher level of risk. Likewise with ergonomic risk factors - the more that are present, the greater the level of risk for developing musculoskeletal disorders in the upper extremities or low back.

Epidemiological evidence associates forceful work, hand/wrist vibration, and highly repetitive work with CTS (see Chapter 5 in Musculoskeletal Disorders and Workplace Factors, NIOSH, 1997). At this point in time there is insufficient epidemiological evidence of an association between CTS and extreme postures alone. However, there is strong epidemiological evidence of a positive association between exposure to a combination of risk factors (e.g. force and repetition, force and posture) and CTS.

## ERGONOMIC RISK FACTORS ASSOCIATED WITH JOB TASKS

The amount of repetition or the duration of a sustained posture determine the exposure to the other risk factors. Keep in mind that repetition does not have to come from the same task being performed consecutively (such as in assembly line work); **the repetition comes from the same musculoskeletal components reacting to similar external forces**. It is certainly easier to talk about repetition during assembly line tasks because the external acts are observably repetitive - and for this reason most epidemiological studies which have associated repetitive task performance with WMSD development have come from assembly line type actions (i.e. auto assembly, poultry processing, etc.). Determination of internal exposures to loading (e.g. to tendons, ligaments, muscles, and nerves) requires complex instrumentation and/or analysis. This has yet to be done as part of the exposure assessment with any prospective epidemiological study because of the difficulty and the cost. However, the exposure of the internal tissues of the body to these risk factors is not necessarily unique for each different tool used - for example the use of a spiking maul and a sledgehammer both involve the same risk factors and similar stresses on the musculoskeletal system.

MNCR summarized the duties of machinist in the Maintenance of Equipment Department as follows (approved 2/26/91):

> "Inspects, repairs, and maintains air brake systems on all diesel powered equipment and on M-Series equipment on New Haven Div.
>
> Installs and removes major components on diesel equipment including oil engines, main generators, air compressors, APU's, and drive motors
>
> Performs periodic equipment inspections in accordance with Metro-North, state, and federal regulations
>
> Completes required paperwork to comply with federal, state, and Metro-North requirements"

MNCR summarized the duties of machinist in the Grand Central Terminal as follows (approved 11/29/90):

> "Fabricates components and tools from steel stock

# EXHIBIT J

1                                                    1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------------------x

5    FRANK A. PRETTER, SR.,

6                      Plaintiff,

7        - against -           00 CIV 4366 (JSR)

8    METRO NORTH COMMUTER RAILROAD COMPANY,

9                      Defendant.

10   ------------------------------------------x

11

12                      347 Madison Avenue
                        New York, New York
13

14                      March 27, 2001
                        2:05 P.M.
15

16

17        EXAMINATION BEFORE TRIAL OF ROBERT O.

18   ANDRES, an expert witness, taken by the

19   defendant, pursuant to Order, held at the

20   above-mentioned time and place, before a

21   Notary Public within and for the State of

22   New York.

23

24                                  ORIGINAL

25

        Jay Deitz & Associates, Ltd.
(212)374-7700 (516)678-0700 (718)527-7700
            Fax (516)678-4488

```
 1                                                        2

 2      A P P E A R A N C E S:

 3

 4

 5

 6          HANNON & JOYCE, ESQS.
                   Attorneys for Plaintiffs
 7                 The Curtis Center  Suite 450
                   Independence Square West
 8                 Philadelphia, Pennsylvania
                   19106
 9          BY:    THOMAS JOYCE, III, ESQ.

10

11

12          METRO-NORTH RAILROAD
                   Attorneys for Defendant
13                 347 Madison Avenue
                   New York, New York  10013
14          BY:    JOSE R. RIOS, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

3

FEDERAL STIPULATIONS

        IT IS HEREBY STIPULATED AND AGREED
by and between the attorneys for the
respective parties herein, that filing
and sealing be and the same are hereby
waived.

        IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the form
of the question, shall be reserved to the
time of the trial.

        IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be sworn to
and signed before any officer authorized to
administer an oath, with the same force and
effect as if signed and sworn to before the
Court.

                    - oOo -

Jay Deitz & Associates, Ltd.
(212)374-7700 (516)678-0700 (718)527-7700
Fax (516)678-4488

1                    Andres                69

2      that has been submitted for peer review.

3          A      I guess I need further

4      clarification.  Are you talking about has

5      anybody in the railroad published an

6      epidemiological study?

7          Q      I'm asking are you aware of any

8      scientific study, whether by the railroad

9      or any source, that quantifies the risk

10     factors that are encountered in the

11     railroad industry?

12         A      In the peer review literature.

13         Q      Peer reviewed literature?

14         A      Not that I'm aware of.

15         Q      Is there any peer reviewed

16     literature, that you are aware of, that

17     quantifies the optimal amount of

18     repetition that an employee in the railroad

19     can have in any particular task?

20         A      As far as a study that's been

21     done in the railroad, published that?

22         Q      Scientific study submitted for

23     peer review.

24         A      Not that I have seen.

25         Q      Same question, any type of study

Andres                    70

1
2   concerning awkward postures, that you are
3   aware of, scientific study that's been
4   submitted to peer review, where it states
5   the optimal amount of awkward posture that
6   a railroad employee should be subjected to?
7        A        Well, I guess I have to answer
8   this in that one of the problems that I
9   have is that, first of all, the railroad
10  has very little research that it has
11  published.  Second of all, the compound
12  question you asked is the optimal amount of
13  repetition.  Even in the research
14  literature that is not related to the
15  railroads, again, we don't have an equation
16  for any particular individual that says
17  that this much repetition is just enough,
18  and if you go just beyond this then it's
19  too much.  That's the type of dose response
20  relationship information we don't have.
21       Q        Do you have any dose response
22  information concerning the tasks that are
23  performed by the 15 employees that are
24  involved in this case, for the different
25  tasks that they perform?

1                    Andres              71

2         A      Again, since we don't have an

3     equation that directly relates the dose to

4     the adverse health outcome, I would have to

5     say I don't have an equation like that.  I

6     haven't seen anything like that published.

7         Q      You mentioned you have been to

8     other railroad sites?

9         A      Yes.

10        Q      Have any of these railroads

11    hired you to perform a dose response type

12    of information, concerning the tasks that

13    are performed by these railroad employees?

14        A      No.

15        Q      It's not an individual risk

16    factor by itself that causes a problem, you

17    mentioned it's a risk factor combined with

18    another risk factor, is that right; for

19    example, repetition together with the

20    length of the time for the repetition?

21        A      I don't believe I said anything

22    about that.

23        Q      That's the question I'm asking

24    you.  Is it true that one risk factor by

25    itself is not enough to cause a problem,

1                    Andres                    81

2    risk factors are during an extended use of

3    a tool; is it possible that given with

4    extended use of a tool it would not cause

5    WMSD?

6         A      It's possible but it becomes

7    less likely in that situation.

8         Q      Again, do you know what is the

9    length of time that an employee can use any

10   given, to use your language here, any given

11   tool; what is the length of time an

12   employee could use it without developing

13   WMSD?

14        A      Again, we don't have that

15   equation to work with.

16        Q      Looking at page 12, paragraph

17   right underneath the table, you mention

18   that gloves were worn for some of the

19   tasks.

20        A      Yes.

21        Q      And the last sentence you state,

22   further investigation would be required to

23   be sure that the gloves did not increase

24   the amount of force that any of these

25   employees had to exert to perform any of

# EXHIBIT K

**Authors:**

James L. Cosgrove, MD
Peter M. Chase, MBA
Norman J. Mast, MEd
Richard Reeves, MA

**Affiliations:**

From the Department of Physical Medicine and Rehabilitation, University of Pittsburgh Medical Center, Pennsylvania (JLC, PMC, NJM); and the Department of Admissions, Cornell University, Ithaca, New York (RR).

**Correspondence:**

All correspondence should be addressed to James L. Cosgrove, MD, 9401 McKnight Road, Suite 202, Pittsburgh, PA 15237.

0894-9115/02/8102-0101/0
*American Journal of Physical Medicine & Rehabilitation*
Copyright © 2002 by Lippincott Williams & Wilkins

Carpal Tunnel

## Research Article

# Carpal Tunnel Syndrome in Railroad Workers

## ABSTRACT

Cosgrove JL, Chase PM, Mast NJ, Reeves R: Carpal tunnel syndrome in railroad workers. Am J Phys Med Rehabil 2002;81:101–107.

**Objective:**  To determine, within a specific industry, if carpal tunnel syndrome (CTS) is associated with job classification or other personal risk factors. To determine if surgical intervention for the treatment of CTS is indicated on the basis of electrodiagnostic criteria.

**Design:**  More than 2500 claimants who screened positive for CTS were subjected to a formal history, physical examination, and electrodiagnostic studies. A total of 900 subjects were randomly selected for this study. The presence of CTS was determined by a method of comparing median minus ulnar nerve distal latency differential (MUD).

**Results:**  There was a statistically significant relationship between CTS and body mass index ($P < 0.001$), wrist index ($P < 0.001$), and age ($P < 0.001$). A total of 43.4% of the participants (391/900) and 38.6% of the wrists (694/1800) had either positive or borderline findings for CTS. There was no difference between the left and right hands. There was no association between job classification and the presence of CTS. Using MUD criteria, more than half of the participants presumed to have CTS did not meet the requirements for diagnosis. Applying the same MUD criteria to all surgical cases, the indication for surgery could not be determined in one-third of the cases (33%, 83/248).

**Conclusions:**  In the population claiming CTS caused by railroad occupations, there was a significant association between CTS and body mass index, age, and wrist index, but not job classification. More than half of the study group and one-third of the surgical subset had normal MUD data.

**Key Words:**  Carpal Tunnel Syndrome, Occupation, Railroad, Obesity, Risk Factors

Since the 1960s, carpal tunnel syndrome (CTS) as a potential cause of hand and arm complaints has been accepted.[1] Initially, occupational CTS was thought to be rare.[1] Cross-sectional population studies in the early 1980s postulated a relationship between CTS and occupational hand use.[2,3] Many of the early studies were flawed because of the reliance on subjective symptoms or physical signs in the absence of confirmatory electrodiagnostic studies (EDS). More recent cross-sectional and longitudinal studies[4–9] have demonstrated mixed results with no consistent association between occupational hand use and CTS.

The theory of repetitive trauma has been postulated as an explanation for occupational CTS.[2] However, longevity (work years) seems to be negatively correlated with CTS.[10] Similarly, increasing physical activity, in either the able-bodied or wheelchair propulsion population, does not increase the risk of developing CTS.[11,12]

Personal attributes of obesity as measured by body mass index (BMI)[4,5,11,13,14] and age[4,5,15] have been associated with CTS. "Square wrist," defined as the finding of increased wrist index, has been identified by some[6,16–18] but not by others[8,19] as associated with slowing of median nerve distal latency. Various common medical disorders are positively correlated with CTS, including diabetes mellitus, gout, and thyroid disease.[20]

Despite inconsistent scientific evidence linking occupational hand use to CTS, there have been numerous legal proceedings claiming that hand activities have either caused or significantly contributed to the development of CTS. Through the systematic evaluation of a large number of claims filed under the provisions of the Federal Employers Liability Act, the association of CTS with occupational activities and a variety of personal, physical, and demographic attributes was explored.

## METHODS

Thousands of railroad employees have become claimants in actions against their employers under the provisions of the Federal Employers Liability Act. Claimants were identified through a variety of screening techniques, primarily organized through their unions or the plaintiff's bar. Almost all individuals completed a paper and pencil questionnaire and some type of EDS before the filing of their claim. All claimants maintained that they had CTS that was caused or aggravated by occupational activities.

Prospectively, the claimants were subject to a comprehensive history, physical examination, medical record review, and EDS (see below). All evaluations were at the behest of the employer, pursuant to the filing by the claimants. Before the performance of a formal evaluation, the claimants completed a short questionnaire identifying past medical history, current medications, avocational hand use, and a standard pain diagram. Each claimant was then interviewed regarding the onset of symptoms, current symptoms, activities that aggravate or relieve symptoms, and medical or surgical treatment to date and its perceived effectiveness. The specifics of occupational activities were also explored, including dates of service, job classification, specific hand use while at work, hours at work, seasonal aspects of work, and the description of tools used. Past medical history and ongoing medical problems were reviewed.

A physical examination was done by one experienced clinician (JLC) to rule out common confounding diagnoses such as cervical radiculopathy, rotator cuff tear, shoulder impingement syndrome, medial or lateral epicondylitis, ulnar or radial nerve entrapment at the elbow, wrist arthritis, carpometacarpal joint arthritis of the thumb, deQuervain's tenosynovitis, flexor or extensor tenosynovitis of the fingers, arthritis of the small joints of the fingers, ulnar neuropathy at Guyon's canal, or vascular impairment to the upper extremity. All individuals underwent anthropometric evaluation using height, weight, calculated BMI, and wrist index.[6,17,18] Tripod pinch, lateral pinch, and five-position grip strength were tested with a hand-held dynamometer.[21] Evaluation for physical signs of CTS assessed Tinel's sign, Phalen's maneuver, and thenar atrophy.[22–24] No subject was excluded from the study group because of findings on the physical examination.

Occupational evaluation was undertaken by using a variety of methods: written job analysis, videotaped job analysis, deposition transcripts, and direct interviews. Given the relatively small number of specific trades involved, the authors obtained a good understanding of the work environment. The jobs were then classified into four separate ergonomic categories, consistent with the standards previously described by Silverstein et al.[3] In some circumstances, because of changes in job environments, there was more than one classification. In those circumstances, the current job was used for classification unless the vast majority of prior work activities involved another job classification.

### EDS Technique

*Preliminary Study.* At the outset of the study, 50 subjects underwent extensive EDS, including sensory, motor, and midpalmar evaluations of both median and ulnar nerves of both hands. All studies were performed by using common techniques with distances of 8 cm (motor distal latency), 14 cm (sensory distal latency), and 8 cm (midpalmar distal latency).[25–27] In rare individuals with extremely large hands, the distal latency for

ensory evaluation was increased to 5 cm. Needle electromyography was erformed on at least two muscles of ach individual, usually the abductor ollicis brevis and first dorsal interosseous of the most involved side. attempts were made to warm the ands. Skin temperature was continally monitored by an Electro-Therm hermistor model TM99A (Cooper Instrument, Middlefield, CT) attached o the surface of the proximal phanx of the middle metacarpophalaneal joint. Despite our attempts to varm the hands, a wide range of skin emperatures occurred (25.4–33.4°C) etween wrists studied.

Absolute values for distal latency of the motor and sensory nerves were eviewed from the 50 preliminary tudies. The most reliable and useful neasure was determined to be the nedian minus ulnar distal latency lifferential (MUD). This methodology nitigated the effects of age and skin emperature and has been corroborated by recently published studies.[4,28,29]

In patients with rough and calloused hands, the midpalmar studies roved to be technically difficult and vere, therefore, not universally performed. All EDS were reviewed by one author (JLC) for possible underlying peripheral neuropathy or other peripheral nerve entrapments. Amplitude proved an unreliable measure because of variety of finger diameters, ages, and skin temperatures.[30,31] Temperature mathematical conversions were not performed. Abnormalities on electromyography were not helpful in diagnosing CTS but were helpful in differentiating between moderate and severe CTS.[27,32]

*Prospective Study.* Over 2500 individuals were then evaluated in a prospective, standard, and rigorous fashion over a 4-yr period. Of that group, 900 files were selected randomly. MUD was considered to be the standard in the diagnosis of CTS. Motor and sensory distal latencies were used

in the evaluation of all individuals. Midpalmar latencies were used selectively—in those cases in which motor or sensory MUDs were either equivocal or contradictory. Midpalmar latencies were also employed in all cases in which motor MUD was abnormal but sensory MUD was considered normal. The utility of mixed midpalmar latencies was limited because of the technical difficulties already described. The following criteria were then employed in the determination of CTS.

(1) Motor MUD: definitive, >1.5 msec; probable, 1.2–1.5 msec; and normal, <1.2 msec[32,33]
(2) Sensory MUD: definitive, >0.8 msec; probable, 0.6–0.8 msec; and normal, <0.6 msec[27]
(3) Midpalmar MUD: definitive, >0.5 msec; probable, 0.4–0.5 msec; and normal, <0.4 msec[34]

The classification of CTS (definitive/probable/normal) was based on the most abnormal MUD among motor, sensory, and midpalmar studies. For statistical analysis, if there was no median sensory response, a default value of 6.0 msec (which always rendered a diagnosis positive for CTS) was assumed. If motor and sensory MUDs were normal and if the ulnar midpalmar latency was unobtainable, a subject was considered not to have CTS.

In those individuals who had undergone prior surgical interventions, a comparison of preoperative and postoperative EDS was undertaken. In many cases, preoperative EDS data were difficult to interpret for reasons such as the absence of ulnar or radial distal latencies, failure to account for skin temperature, poor description of techniques, or no numerical data supplied. CTS surgery was considered appropriate in those cases in which preoperative data were consistent with the diagnosis of CTS. A determination of equivocal was rendered if there were conflicting or insufficient EDS data. Indeterminate cases were

those in which both preoperative and postoperative EDS were considered to be normal by the above criteria.

## Statistical Analysis

A complete data set of 900 randomly selected individuals (1800 wrists) was obtained from a pool of greater than 2500 claimants. Independent variables were identified by running a stepwise regression on a small pilot sample of 100 patients taken from the 900 randomly selected individuals. The sample of 900 was then randomly divided into a screening sample ($n = 500$) and a calibration sample ($n = 400$) for the purpose of creating a cross-validation coefficient. A cross-validation coefficient was appropriate for this study given the researchers' goal to determine how well a regression equation obtained from one sample performs on another sample from the same population.[35]

Models for the left and right hands were generated using the screening sample and then applied to the cross-validation sample to generate a cross-validation coefficient. Given the high correlation between the left and right indexes, a model using the mean wrist index (for both left and right hands) was created to predict CTS in either hand.

Receiver operating characteristic curve analysis was performed to determine how accurately the regression equation predicted the results.

## RESULTS

Railroad workers were almost exclusively men (>99%, 894/900) and relatively old (mean, 50.6 yr; range, 28–71 yr). This was an overweight population with a mean BMI of 30.7 kg./m² (range, 19.6–52.6 kg./m²). Most workers were obese, with only 12% at normal weight (BMI, 19–25.9), 33% mildly overweight (BMI, 26–29.9), 50% moderately obese (BMI, 30–40), and 5% morbidly obese (BMI > 40).[36]

**TABLE 1**
*Coefficient summary for both hands*

| Model 1 | Unstandardized Coefficients | Standard Error | Beta | t Score | Significance |
|---|---|---|---|---|---|
| Constant | −5.807 | 0.694 | | −8.368 | |
| Wrist index mean | 6.364 | 0.928 | 0.214 | 6.855 | <0.001 |
| Age | 0.01361 | 0.004 | 0.113 | 3.618 | <0.001 |
| Body mass index | 0.04765 | 0.006 | 0.258 | 8.266 | <0.001 |

Dependent variable: carpal tunnel syndrome; 1 = positive carpal tunnel syndrome; 0 = negative carpal tunnel syndrome.

A square wrist (wrist index, ≥0.70)[16,17] was present in 49.8% of right wrists and 45.0% of left wrists. Hand dominance was consistent with that of the general population: right hand, 88% (788/900); left hand, 8% (75/900); ambidextrous, 4% (37/900).

Using criteria previously described by Silverstein et al.,[3] jobs were classified and distributed as follows: category I (low force/low repetition), 18.8%; category II (low force/high repetition), 20.7%; category III (high force/low repetition), 59.8%; category IV (high force/high repetition), 0.7%. The percentage of positive or borderline cases of CTS within each job classification was as follows: category I, 47.9%; category II, 40.0%; category III, 43.4%; and Category IV, 50.0%.

Of the overall population, 43.5% of the claimants (401/900) and 38.6% of the wrists (694/1800) had a determination of either probable or positive CTS. Multiple regression analysis revealed the following model: predicted score = −5.807 + (wrist index mean × 6.364) + (age × 0.01361) + (BMI × 0.04765), (1 = CTS, 0 = no CTS). Predictive values for the specific coefficients in the model can be seen in Table 1. There was not a significant difference between the CTS models for the left and right hands. There was no statistical significance or positive trend noted in job classifications and CTS. The cross-validation coefficient was 0.044, indicating that the model was generalizable within this population (Table 2).

Receiver operating characteristic curve analysis was performed to help determine if the model provided clinical relevance. The analysis revealed an area under the curve of 0.707 (Fig. 1). Therefore, the model accurately predicted the results almost 71% of the time.

The subjects' wrists were quite symmetric for the diagnosis of CTS; 83% of the participants (795/900) had left and right wrists concordant for the diagnosis of CTS (positive, borderline, or negative). If borderline and positive cases were combined into one classification (positive or [illegible]

[illegible]

Surgi[illegible] of the right wrists (125/900) and 13.4% of the left wrists (122/900). On the basis of electrodiagnostic criteria alone. surgical intervention was considered appropriate in 41%, equivocal in 26%, and indeterminate in 33%.

**TABLE 2**
*Correlation of predicted carpal tunnel syndrome with actual carpal tunnel syndrome in the calibration sample*

[illegible]

$r^2$ from correlation [illegible]

Difference: 0.044

Correlation is significant at the 0.01 level (two-tailed).

## DISCUSSION

Railroad workers claiming occupational CTS were evaluated systematically for three separate but related questions:

(1) Within this population, was CTS associated with specific occupational duties?
(2) Were there personal risk factors that could contribute to the presence of CTS?
(3) In claimants undergoing surgery, were EDS findings consistent with CTS?

The authors' reliance on EDS—specifically, prolongation of MUD—to define CTS may prove contentious. Definitions of CTS vary widely throughout the medical literature.[1,3,6,7,9,23,28] The presence of symptoms in the median nerve distribution has only modest sensitivity, specificity, and predictive value when using EDS as the standard.[37,38] Similarly, clinical signs correlate poorly with abnormal EDS.[22–24] The litigation process raises additional concerns as to the utility of clinical signs and symptoms.[39,40] Given [illegible] litigation and [illegible] population [illegible]

Similar to the controversy in defining CTS, determining the most appropriate electrodiagnostic [illegible]



**Figure 1:** Receiver operating characteristic curve analysis; diagonal segments are produced by ties. The analysis revealed an area under the curve of 0.707.

niques and normative values are equally problematic. Standard techniques employed over relatively longer distances diminish the effect of measurement error. Comparing median to ulnar latencies mitigates the effect of age and temperature.[4,28,29] The more CTS "sensitive" technique of midpalmar latency[25,34] was technically demanding with this population and, therefore, of limited utility. It was elected not to pursue needle electromyography in this population as our preliminary study, consistent with others, confirmed that this did not aid in the diagnosis of CTS, merely differentiating between moderate and severe CTS.[32] Median sensory response was absent in only four of 1800 wrists tested. In all of those cases, the motor MUD was also positive for CTS. Therefore, the decision to assign a value of 6.0 msec to the median nerve sensory distal latency had no bearing upon the analysis.

The reliance on MUD, the limited use of midpalmar studies, and the absence of needle electromyography may have decreased the sensitivity for determining CTS. It is proposed that the EDS techniques, as employed in this study, represent the most reliable and objective manner of deter-

mining the presence or absence of CTS in a large population.[27–29]

This study is neither cross-sectional nor longitudinal, and extrapolation of these findings to a more general population may prove difficult. It represents a self-selected "screened" population. Accordingly, there can be no determination of incidence or prevalence. This study does suffer from a significant selection bias; a population of primarily blue-collar workers who believe that they have carpal tunnel syndrome and who are willing to enter into litigation. Survivor bias has been suggested as a possible explanation for the failure of previous selective population studies to detect an association between CTS and work activities.[41] As reflected in the number of retired or disabled subjects (7%), with almost none being disabled because of CTS (0.3%), it is unlikely that survivor bias is a factor in this study.

Given the extremely small number of female employees examined (6/900), no meaningful discussion of sex is possible. Similarly, because the low prevalence, diabetes, gout, and thyroid disease did not reach statistical significance in analysis of variance testing. Consistent with other stud-

ies, the multiple regression analysis revealed a high degree of statistical significance between CTS and age, wrist index and BMI.[4,5,6,9,11,13] However, the 71% predictive accuracy of the model is insufficient for clinical application.

Occupational classification was not associated with the presence of CTS. This finding is consistent with other cross-sectional and longitudinal studies.[6–9] The small number of individuals in the most extreme job classification of category IV (0.7%) may have obscured an occupational association. Nevertheless, there was no trend of increased findings of CTS in the groups with higher ergonomic stress.

The study population consisted of railroad workers who were diagnosed as having CTS on the basis of screening tests of questionnaires and some type of EDS. A large percentage of the claimants (56.5%) and wrists (61.4%) were determined not to have CTS by MUD criteria. Similarly, one-third of the claimants who did undergo surgery had normal MUD findings (by our criteria) both before and after surgery. Our results should not be interpreted as a recommendation for the sole reliance on EDS procedures and the elimination of the clinical evaluation in the diagnosis of CTS.[1,22,38] However, it must be recognized that there are clear societal implications for the current practice in screening for CTS. Declaring an individual as having CTS has profound effects on feelings of health and well-being, employee-management relations, legal proceedings, and medical procedures. It is incumbent on electromyographers to employ rigorous and appropriate standards in the performance of carpal tunnel evaluations. At present, the association of carpal tunnel syndrome with hand activities remains unproved. It may be that with CTS, as with many of the other medical and legal issues of our time, "litigation, fear, bias, and greed interfere with

scientific efforts to answer questions of importance to the public health and that antiscientific social attitudes encourage premature or ill-informed political and legal solutions to medical questions."[42]

## REFERENCES

1. Phalen GS: The carpal tunnel syndrome: Seventeen years experience in diagnosis and treatment of 654 hands. *J Bone Joint Surg(Am)* 1966;48:211–28

2. Armstrong TJ, Foulke JE, Joseph BS, et al: Investigation of cumulative trauma disorders in poultry processing plant. *Am Ind Hyg Assoc J* 1982;43:103–16

3. Silverstein BA, Fine LJ, Armstrong TJ: Occupational factors in carpal tunnel syndrome. *Am J Ind Hyg* 1987;11:343–58

4. Atroshi I, Gummesson C, Johnsson R, et al: The prevalence of carpal tunnel syndrome in a general population. *JAMA* 1999;282:153–8

5. Latko WA, Armstrong TJ, Franzblau A, et al. Cross-sectional study of the relationship between repetitive work and the prevalence of upper limb musculoskeletal disorders. *Am J Ind Med* 1999;36:248–59

6. Radecki P: Variability in the median and ulnar nerve latencies: Implications for diagnosing entrapments. *J Occup Environ Med* 1995;37:1293–9

7. Schottland JR, Kirschberg GJ, Fillingim R, et al: Median nerve latencies in poultry processing workers: An approach to resolving the role of industrial "cumulative trauma" in the development of carpal tunnel syndrome. *J Occup Med* 1991; 33:627–31

8. Stentz TL, Riley MW, Glismann CL, et al: *Carpal Tunnel Syndrome Prevalence in a Heavy Railroad Maintenance and Repair Facility*. Proceedings of the Human Factor Society 38th Annual Meeting, Atlanta, October 12–16, 1992, pp 788–90

9. Nathan PA, Keniston RC, Myers LD, et al: Longitudinal study of median nerve sensory conduction in industry: The relationship to age, gender, hand dominance, occupational hand use, and clinical diagnosis. *J Hand Surg(Am)* 1992;17:850–7

10. Cannon LJ, Bernacki EJ, Walter SD: Personal and occupational factors associated with carpal tunnel syndrome. *J Occup Med* 1981;23:255–8

11. Nathan PA, Keniston RC, Myers LD, et al: Obesity as a risk factor for the slowing of sensory conduction of the median nerve in industry: A cross-sectional and longitudinal study involving 429 workers. *J Occup Environ Med* 1992;34:379–83

12. Boninger ML, Robertson RN, Wolff M, et al: Upper limb nerve entrapments in elite wheelchair racers. *Am J Phys Med Rehabil* 1996;75:170–6

13. Werner RA, Albers JW, Franzblau A, et al: Relationship between body mass index and the diagnosis of carpal tunnel syndrome. *Muscle Nerve* 1994;17:1632–6

14. Werner R, Franzblau A, Albers JW, et al: Influence of body mass index and work activity on the prevalance of median mononeuropathy at the wrist. *Occup Environ Med* 1997;54:268–71

15. Hennessey WJ, Falko FJE, Braddom RL: Median and ulnar nerve conduction studies: Normative data for young adults. *Arch Phys Med Rehabil* 1994:75:259–64

16. Radecki P: A gender specific wrist ratio and the likelihood of median abnormalities at the carpal tunnel. *Am J Phys Med Rehabil* 1994;73:157–62

17. Gordon C, Johnson EW, Gatens PF, et al: Wrist ratio correlation with carpal tunnel syndrome in industry. *Am J Phys Med Rehabil* 1988;67:270–2

18. Johnson EW, Gatens T, Poindexter D, et al: Wrist dimensions: Correlation with median sensory latencies. *Arch Phys Med Rehabil* 1983;64:556–7

19. Spozsato RC, Riley MW, Ballard JL, et al: Wrist squareness and median nerve impairment. *J Occup Environ Med* 1995; 37:1122–6

20. Stevens JC, Beard CM, O'Fallon WM, et al: Conditions associated with carpal tunnel syndrome. *Mayo Clin Proc* 1992; 67:541–8

21. Hoffmaster E, Lech R, Niebuhr BR: Consistency of sincere and feigned grip exertions with repeated testing. *J Occup Med* 1993;35:788–94

22. Kuhlman KA, Hennessey WJ: Sensitivity and specificity of carpal tunnel syndrome signs. *Am J Phys Med Rehabil* 1997;76:451–7

23. Gerr F, Letz R: Sensitivity and specificity of tests for carpal tunnel syndrome vary with comparison subjects. *J Hand Surg (Br)* 1998;23:151–5

24. Katz JN, Larson MG, Sabra A, et al: The carpal tunnel syndrome: Diagnostic utility of the history and physical examination findings. *Ann Intern Med* 1990; 112:321–7

25. Daube JR: Percutaneous palmar median nerve stimulation for carpal tunnel syndrome. *Electroencephalogr Clin Neurophysiol* 1977;43:139–40

26. Jablecki CK, Andary MT, Yuen TS, et al: Literature review of nerve conduction studies and electromyography for the evaluation of patients with carpal tunnel syndrome. *Muscle Nerve* 1993;16:1392–414

27. Stevens JC: AAEE minimonograph #26. The electrodiagnosis of carpal tunnel syndrome. *Muscle Nerve* 1987;10:99–113

28. Salerno DP, Franzblau A, Werner RA, et al: Median and ulnar nerve conduction studies among workers: Normative values. *Muscle Nerve* 1998;21:999–1005

29. Salerno DF, Werner RA, Albers JW, et al: Reliability of nerve conduction studies among active workers. *Muscle Nerve* 1999;22:1372–9

30. Bolton CF, Carter KM: Human sensory nerve compound action potential amplitude: Variation with sex and finger circumference. *J Neurol Neurosurg Psychiatry* 1980;43:925–8

31. Bolton Denys HE: AAEE minimonograph #14. The influence of temperature in clinical neurophysiology. *Muscle Nerve* 1991;14:795–811

32. Vennix MJ, Hirsh DD, Chiou-Tan FY, et al: Predicting acute exacerbation in carpal tunnel syndrome. *Arch Phys Med Rehabil* 1998;79:306–12

33. Sander HW, Quinto C, Saadeh PB, et al: Sensitive median-ulnar motor comparative techniques in carpal tunnel syndrome. *Muscle Nerve* 1999;22:88–98

34. Redmond MD, Rivner MH: False-positive electrodiagnostic tests in carpal tunnel syndrome. *Muscle Nerve* 1988;11:511–7

35. Pedhazur EJ: *Multiple Regression in Behavioral Research*. New York, Harcourt Brace, 1997

36. Najjar MF, Rowland M: Anthropometric reference data in the prevalence of overweight. *Vital Health Stat* 1987;238:1–73

37. Katz JN, Larson MG, Fossel AH, et al: Validation of surveillance case definition of carpal tunnel syndrome. *Am J Public Health* 1991;81:189–93

38. Stevens JC, Smith BE, Weaver AL, et al: Symptoms of 100 patients with electromyographically verified carpal tunnel syndrome. *Muscle Nerve* 1999;22:1448–56

39. Sander RA, Meyers JE: The relationship of disability to compensation status in railroad workers. *Spine* 1986;11:141–3

40. Hadler NM: Workers' compensation and chronic regional musculoskeletal pain (editorial). *Br J Rheumatol* 1998;37: 815–23

41. Stock SR: Workplace ergonomic factors and the development of musculoskeletal disorders of the neck and upper limbs: A meta-analysis. *Am J Ind Med* 1991;19:87–107

42. Deyo RA, Psaty BM, Simon G, et al: The messenger under attack—Intimidation of researchers by special interest groups. *N Engl J Med* 1997;336:1176–80

## Continuing Call for Papers

The primary purpose of *The American Journal of Physical Medicine & Rehabilitation* (AJPM&R) is to facilitate the dissemination of scholarly work on the practice, research, and educational aspects of physical medicine and rehabilitation. Toward fulfilling its purpose, the AJPM&R invites submission of original papers, particularly in the categories given below, for consideration to publish:

**Scientific research papers:** Scientific investigations that advance the field of physiatric medicine.

**Literature reviews:** Critical summaries and assessments of previously published information on topics related to the field of physical medicine and rehabilitation. Because of space limitations, reviews will be accepted only under special circumstances.

**Case studies:** Presentations of the diagnosis, treatment, and outcomes of individual cases of specific conditions to improve patient care.

**Brief reports:** Short articles reporting on research techniques, statistical techniques, and educational and clinical aspects of physical medicine and rehabilitation.

**Clinical notes:** Comments on patient diagnosis or treatment resulting from personal clinical experience.

**Commentaries:** Indepth, editorial-like, articles on matters relating to the clinical, scientific, and educational aspects of physical medicine and rehabilitation.

**Letters to the Editor:** Objective critiques and comments covering material published in a recent issue of the *Journal*.